Amy B. Vandeveld, State Bar No. 137904
LAW OFFICES OF AMY B. VANDEVELD
1850 Fifth Avenue, Suite 22
San Diego, California 92101
Telephone: (619) 231-8883
Facsimile: (619) 231-8329

Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| MAURIZIO ANTONINETTI | Case No.: 05 CV 1660 J (WMc) |
|---|---|
| Plaintiff, | **AMENDED PRETRIAL ORDER** |
| vs. | |
| CHIPOTLE MEXICAN GRILL, INC. and DOES 1 THROUGH 10, Inclusive, | Pretrial Conference:   September 10, 2007<br>Time :        9:00 a.m.<br>Judge:   The Honorable Napoleon A. Jones, Jr. |
| Defendants. | |

Following pretrial proceedings pursuant to Fed.R.Civ.P. 16 and Civil Local Rule 16.1.(f)(6).

**IT IS ORDERED:**

## I.

This is an action for injunctive relief under the Americans with Disabilities Act ("ADA") and for relief and damages under California Civil Code Sections 51, 51.5, 52, 54, 54.1 and 54.3. The Plaintiff, MAURIZIO ANTONINETTI, is a paraplegic who requires a wheelchair for mobility. Defendant CHIPOTLE MEXICAN GRILL, INC. ("CHIPOTLE") owns and operates restaurants, which are places of public accommodation. Plaintiff's Complaint, filed on August 22, 2005 and Defendant's Answer, filed on October 3, 2005, raise the issues at issue in this case. Plaintiff will not seek relief under California Civil Code Section 55, as that relief is otherwise available under other statutes.

**II.**

Federal jurisdiction and venue are invoked upon the ground that Plaintiff has alleged violations of the Americans with Disabilities Act (42 U.S.C. §§ 12131 et seq.), among other state claims for relief, such that the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff argues that Defendant has also violated Plaintiff's rights under state law, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Defendant denies it violated Plaintiff's right and argues that the Court should decline to exercise supplemental jurisdiction. This Court has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

**III.**

The following facts are admitted and require no proof:

1.      Scott Shippey was designated by Chipotle as its Person Most Knowledgeable regarding design and construction of the food viewing counters and the design, construction and alteration of the subject properties.

2.      Ronald Sedillo was designated by Chipotle as the Person Most Knowledgeable regarding Chipotle's policies, practices and procedures relating to accommodating persons with disabilities so they can view food items available for selection and the preparation of their food.

3.      Ronald Sedillo was designated by Chipotle as the Person Most Knowledgeable regarding the training of employees in relation to the preparation of food items, including preparing food while customers watch.

4.      Jim Adams was designated by Chipotle as the Person Most Knowledgeable regarding Chipotle's marketing materials and the content of Chipotle's website.

5.      Kim Blackseth was designated as Defendant's expert witness.

6.      Matthew Cieslak began working at the Pacific Beach Chipotle in August of 2005 and is currently the general manager. He oversees the job performance of other employees.

7.   Josefina Garcia began working for Chipotle in July of 2004. She worked at the Encinitas Chipotle from May of 2005 to September of 2006 as a general manager.

8.   The Know is a part of Chipotle's training manual and was produced pursuant to a Confidentiality Agreement.  Cieslak uses The Know to train other employees.

9.   The Chipotle restaurant on Garnet Avenue in Pacific Beach opened for first occupancy in April, 2002.

10.   The Chipotle restaurant in Encinitas opened for first occupancy in May, 2002.

11.   Chipotle restaurants are similar in design with respect to the food lines. Exhibit. 25 to Scott Shippey's Deposition depicts the typical food serving line at Chipotle restaurants.  Food lines are the same as serving lines.

12.   Customers who order by fax or the internet never encounter or view the tortilla station.

13.   In-store customers first encounter the tortilla station at the food serving line, where the customer's tortilla is warmed and the customer is asked which type of item they would like (a burrito, a bol or tacos).

14.   If a burrito is selected, the tortilla is then sent to the hot well table where the selected main ingredient is placed on the tortilla.  The hot well table is depicted on the left side of Exhibit 26 to Shippey Depo.

15.   The tortilla is then sent to the salsa station where additional items are placed on the tortilla and the tortilla is then folded and wrapped.  The salsa station includes salsa, guacamole, cheese and lettuce and is depicted on the right side of Exhibit 26 to Shippey Depo.

16.   The customer then moves to the cash register counter where they pay for their food.

17.   Customers get to customize their burritos.

18.   In-store standing customers' burritos are made in plain view on the food

1   line.   In-store standing customers have the opportunity to customize their burrito

2   pursuant to their individual preferences.

3       19.   Burritos are made right in front of the in-store customers and the customers

4   get to see and select exactly what goes into their burritos.

5       20.   Employees are trained to assist new customers who "look lost...(who stare)

6   up the menu boards blankly."

7       21.   Chipotle employees sometimes point to the food items to give customers a

8   better illustration of where they should be directing their attention.

9       22.   Chipotle suggests , as one way of helping customer differentiate one item

10  from another, that food crew members point to food items as they're describing them so

11  that customers can differentiate one item from another.

12      23.   Employees are taught that people "eat with their eyes." Chipotle restaurants

13  are designed to be a "Feast for the Eyes."

14      24.   Burritos are to be built toward the food crew member so that customers can

15  see the burrito being built.

16      25.   The WOW factor is giving great customer service.  Chipotle employees are

17  trained that "the WOW factor" is, among many other things, about customers being able

18  to see their burritos being built right before their eyes.

19      26.   Chipotle food crew "assembles what you want, how you want it, right in

20  front of you."  Customers tell the crew their version of the perfect burrito and the crew is

21  "happy to oblige."

22      27.   Customers choose exactly what they want in their burritos, while customers

23  have the opportunity to watch the making of their burritos.  Customers can choose, for

24  example, a little more salsa, a little less sour cream.  Customers get to build their version

25  of the "perfect burrito."

26      28.   Chipotle designed its restaurants so that people can see into the kitchen "to

27  bring customers more completely into the dining experience."

28      29.   Chipotle restaurants are constructed with a 44 inch high wall between the

1   line of customers and the food preparation area (hereinafter "the wall").

2     30. The City of Encinitas issued the Certificate of Occupancy for Chipotle at

3   268 N. El Camino Real in Encinitas, California on May 15, 2002.

4     31. The City of San Diego issued the Certificate of Occupancy for 1504 Garnet

5   Avenue in San Diego, California on April 1, 2001.

6     32. Transparent sneeze guards are located at the tops of the walls and are held

7   in place by metal strips about 2 inches high.  Sneeze guards are required along the food

8   service lines at the restaurants pursuant to CURFFL Sections 114080(b)(2)(A) and

9   114080(c) and Health & Safety Code Section 114080.

10     33. The top of the metal strip which holds the sneeze guard above the wall is

11   approximately 46 inches from the finished floor.

12     34. The food preparation counters, on the food crew side of the wall, are

13   approximately 34-35 inches from the finished floor.

14     35. The average eye level of persons in wheelchairs is between 43 and 51

15   inches from the finished floor.

16     36.  The sneeze guard, with the two-inch metal strip, sits atop the 44 inch wall

17   and is recessed from the front edge of the wall by approximately  4 inches.  The view of

18   the food service counter is obstructed to a height of 46 inches from the finished floor.

19     37. If a person's eyes are at a height of 51 inches, and are 12 inches from the

20   wall at the food service line, the person can see no portion of the food service counter, the

21   food items available for selection, or the preparation of their food.

22     38. If a person's eyes are at a height of 43 inches and are 12 inches from the

23   wall at the food service line, the person can see no portion of the food service counter, the

24   food items available for selection, or the preparation of their food.

25     39. Mr. Antoninetti is disabled and uses a wheelchair for mobility.

26     40. At the site inspections of October 6, 2006, Antoninetti was not shown any

27   food items until he asked to see them.  He was shown each item he asked to see.

28     41. Antoninetti wants to be able to have the "Chipotle experience" - the

opportunity to see all of the wonderful, tasty ingredients on display.  He wants to be able to enjoy the experience of watching his burrito assembled and rolled.  He wants to be able to have the opportunity to make his perfect burrito.  He wants to be able to enjoy his "Chipotle experience" without feeling as though he is inconveniencing the employees or the other customers behind him in line.  He wants to be able to move quickly through the line like other standing customers.

42.     Plaintiff ate dinner with his family at the San Diego restaurant on the Sunday before his deposition in this case.

43.     Kim Blackseth's experience at Chipotle restaurants was similar to his experience of ordering food at a Del Taco or Jack-in-the-Box or Taco Bell.

44.     Customers at Del Taco or Jack-in-the-Box or Taco Bell are not able to clearly see the assembly of their food, if at all, and have limited opportunity to customize their food items.

45.     At Chipotle, some customers are able to see the food items available for selection, some are not, depending upon, among other things, the height of their eyes, their height and their vision.  The food is made right in front of the customer.  The interaction between say, Taco Bell customers and the food crew, is different than the interaction between Chipotle customers and its food crew.

46.     When Blackseth was a customer at Chipotle restaurants, he was not shown any food items available for selection, as seeing food items was not important to him and he did not ask to see any food items..

47.     Blackseth did not view the portions of the ingredients being placed in his burritos, nor did he ask for more or less of any ingredient, as that was not important to him.

48.     Blackseth never had food items shown to him at the cashier counter, nor was his food assembled for him at the cashier counter, as he never asked for these things because they were not important to him.  The only transaction he personally observed at the cashier counter was the payment for food items.

49.     Blackseth never saw food lifted for any customers and it was never lifted for him, nor did he ask for or want the food lifted for him, nor did he observe any other customers ask for the food to be lifted.

50.     Chipotle serves "quick gourmet."

51.     Chipotle's cashier counter is compliant with disabilities regulations.

IV.

The reservations as to the facts recited in paragraph III above are as follows:

52.     Defendant objects to paragraphs 23, 24, 25, 35, 36, 37, 38, 49 and 50 as being irrelevant.  Defendant further objects to paragraph 28, 41, 44, 45, 47 and 48 as being vague, ambiguous and irrelevant.

Plaintiff objects to paragraph 12 as being irrelevant.  Plaintiff further objects to paragraphs 46, 47 and 48 to the extent they refer to "the importance" of the Chipotle experience to Mr. Blackseth, as his subjective views are irrelevant.

V.

The following facts, though not admitted, are not to be contested at the trial by evidence to the contrary:

53.     The "Chipotle Experience" involves customers following their burritos as they're being made and directing what they want in their burritos.  One of the "great things about Chipotle" is that customers follow their food items as they're being prepared and they direct what goes into their burrito.

54.     In their training, Chipotle employees are taught that a very important part of the Chipotle experience is the appearance of the food.

55.     The eye level of Kim Blackseth (Chipotle's expert) is at a height of 48 inches. In the course of measuring the food counter, Blackseth looked over the wall as he was next to, touching and measuring the counter.

56.     Prior to August 30, 2006, the seating at the Pacific Beach Chipotle did not comply with the ADAAG.

57.     Prior to August 30, 2006, the seating at the Encinitas Chipotle did not

1    comply with the Americans with Disabilities Act Accessibility Guidelines (ADAAG.)

2        58.    Chipotle tries to provide high quality food fast so that the customers have

3    "instant gratification".

4        59.    Chipotle tracks the number of transactions during a given time frame.

5        60.    The La Jolla Chipotle typically has 120 to 150 transactions per hour.

6        61.    The Encinitas Chipotle has about 84 customers going through the line from

7    noon to 1:00 p.m.  Customers are served in less than one minute.

8        62.    Chipotle recognizes that customers want their food fast, that they want

9    instant gratification.

10       63.    Employees are taught that customers love to interact and watch closely as

11   their meal is put together.

12       64.    The Pacific Beach Chipotle typically has 150 transactions during the three-

13   hour lunch period from 11:00 a.m. to 2:00 p.m.  From 12:00 p.m. to 1:00 p.m., Pacific

14   Beach has approximately 60 to 65 transactions, with an average of 70 to 80 customers

15   being served in that hour.

16       65.    Antoninetti's eye level is 45 inches.   He could not see over the wall.

17       66.    The Know contains everything you need to know to be a manager at

18   Chipotle.  Managers are expected to convey to the crew members all of the information in

19   The Know that relates to customer service.

20       67.    Antoninetti never saw his burrito assembled.

21       68.    At the site inspections, Chipotle employees showed Antoninetti the food

22   items individually by tongfuls, handfuls and in plastic cups, after he asked to see them.

23   Antoninetti never asked to have his burrito assembled at the cashier counter or at an

24   adjacent table.

25                                            VI.

26       The following issues of fact, and no others, remain to be litigated upon the trial:

27       69.    Chipotle employees are trained that it is important for customers to be able

28   to see the making of their burritos.

                                             8

70.     It is typical that customers will watch the amount of meat being put into their burrito and ask for a little bit more.  The customer can see the size of the portion already provided.

71.     Chipotle has received numerous complaints that customers in wheelchairs cannot see over the wall.

72.     Employees are taught that appearance of the food is very important and seeing the food is also an important part of the "Chipotle experience."  In fact, regular inspections are made of the food to ensure the appearance is up to Chipotle standards.

73.     Chipotle teaches its employees that the appearance of food greatly influences the perception of the food.  It wants its customers to see "visually fresh" food.

74.     As customers place their orders, Chipotle employees are supposed to repeat the order back to the customer and to point to the items the customers has ordered. This correlates the description on the menu board with the food on the line.  This is important because some people are visual eaters and "if it looks good then they'll want it."

75.     The beans are inspected to determine if they have a hardened crust and are too old to still be on the line. A crust could effect the customer's evaluation of the food. Customers can instantaneously make a decision to decline the crusty beans.

76.     Showing customers in wheelchairs samples of food in spoons does not allow them the opportunity to judge the freshness of the food - they cannot see if beans are crusty or the barbacoa is dry, for example.

77.     Mr. Antoninetti was only shown food items one at a time, by spoonfuls, handfuls or in small plastic cups during the site inspections of October 6, 2006.  This method is unappetizing and does not allow him to determine the freshness of the food, the elements of a particular ingredient (i.e. whether there are chunks of bacon in the pinto beans) or whether one item is more appetizing in comparison to another item..

78.     Showing Antoninetti food items in cups, by spoonfuls, by tongfuls and handfuls significantly extended the amount of time to serve Mr. Antoninetti.  Other customers were annoyed.  One woman rolled her eyes in annoyance, one man walked

1    away.

2        79.    Antoninetti visited local Chipotle 2 times before his lawsuit and has

3    returned to Chipotle 2 to 4 times, reluctantly, to make his family happy.  With the site

4    inspections, his visits total 6 to 8.

5        80.    During the noticed site inspections, Antoninetti ordered food. Even with

6    Chipotle's counsel present, Chipotle employees never assembled Antoninetti's burrito in

7    front of him. He never had the opportunity to see the portions of items placed in his

8    burrito.

9        81.    It may take five minutes for a Chipotle employee to bring ingredients to a

10   separate table so that a customer in a wheelchair could have the experience of having

11   their burrito built right before their eyes.

12       82.    Employees are trained to explain Chipotle's menu, how to order, and other

13   information regarding customization.  The explanation varies from employee to employee

14   and from customer to customer.

15       83.    Chipotle employees are taught that burritos are made right in front of the

16   customers and the customers get to see and select exactly what goes into their burritos.

17   This is part of the "Chipotle experience" and this is what makes Chipotle different from

18   other fast food Mexican restaurants.

19       84.    Every item available for inclusion in a burrito is listed on the menu board.

20       85.    The menu board fails to accurately or adequately describe all of the items

21   available for selection.

22       86.    Customers have the opportunity to customize their burrito pursuant to their

23   individual preferences.

24       87.    Plaintiff was able to, and did, choose exactly what he wanted in his burrito.

25       88.    Chipotle employees generally point to the menu board, and from there ask a

26   series of questions, followed by a quick description of the food.  If a customer is a first

27   time customer, Chipotle employees generally discuss the menus with the customers, as

28   well as food quality and store atmosphere.

89.     Chipotle employees help the customers perceive the food items in other ways, including through verbal description.

90.     On February 23, 2007, Chipotle implemented a nationwide "Customers With Disabilities" policy that sets forth in writing that which Chipotle has always done informally – provide excellent customer service to all its customers, including customers with disabilities (the "Policy").

91.     Chipotle disseminated the Policy via high priority email to its Regional Directors, Human Resources Training Directors, and Operations Directors and began formally training its employees on the Policy between March and May 2007.

92.     The Policy training efforts involve the Director of Training and Development going out to the field and working in conjunction with Chipotle's Human Resource Generalists and Human Resource Training Directors to train Chipotle's Operations Directors, Area Managers, and Managers, who will in turn train their respective crews.

93.      The Policy is incorporated into Chipotle's "The Know" policy as an addendum and has been added as a new section: "5.5 Customers With Disabilities."

94.     The Policy provides:  "Excellent customer service is of paramount importance at every Chipotle restaurant at all times.  A customer with a disability (for example, a visual or mobility impairment) may benefit from some alternative means of presenting or describing our food.  In all such cases the restaurant staff will offer a suitable accomodation based on the individual circumstances, and will be responsive to the customer's requests.  Depending on the circumstances, our crew member or manager may ask the customer if we can accommodate them during their visit.  Examples of some of the ways we accommodate individuals include: (1) Samples of the food can be placed in soufflé cups and shown or handed to the customer.  (2)  Some customers may prefer an opportunity to see or even sample the food at a table.  (3)  Customers may simply wish to have the food or food preparation process described to them.  (4)  Or combinations of the above accommodations with any other reasonable accommodation requested or

appropriate for the individual.  The point of good customer service is that it has to be personalized.  It is the manager and crew's responsibility to ensure that the experience a customer with a disability has is excellent.  Considerations of throughput, productivity or efficiency are secondary to ensuring a positive experience for disabled customers.  Crew members are encouraged to inform their Restaurant Manager regarding the experiences of their disabled customers and such experiences will be considered during the performance review process, both for the crew member and the manager."

95.    Chipotle has adopted this as its official policy, and holds individuals responsible for following the policy. Consequently, there is no cognizable danger of Plaintiff suffering any future alleged disability discrimination at the Restaurants.

96.    As evidence of the success and effectiveness of the Policy, Chipotle received an email from a customer who visited Chipotle's River Oaks restaurant in Houston, Texas on March 13, 2007. Chipotle received this email in the ordinary course of business via the "SPEAK" section of Chipotle's website, which is reachable directly at www.chipotle.com/speak.

97.    The Policy was carried out in Plaintiff's case.  For example, when Plaintiff first visited a Washington D.C. Chipotle location, a Chipotle worker told Plaintiff about the ingredients available. And, when Plaintiff visited the Encinitas location in February 2005, a Chipotle worker asked him what ingredients he wanted in his burrito.

98.    At the site inspections, the food crew showed him samples of the food ingredients.  To the extent no further accommodations were provided, that was because Plaintiff refused them.

99.    Chipotle employees generally point to the menu board, and from there ask a series of questions, followed by a quick description of the food.  If a customer is a first time customer, Chipotle employees generally discuss the menus with customers, as well as food quality and store atmosphere.

100.    In looking over the wall while taking measurements, Blackseth could see a portion of the tortilla closest to the Chipotle employee.

101.    Other Chipotle customers have not been shown food items available for selection.

102.    Other Chipotle customers have been shown food items available for selection.

103.    Customers of the restaurants make their food selections by looking at the large menu hung above the counter.

104.    Plaintiff placed his order by looking at the menu board at the restaurants.

105.    Plaintiff was able to, and did, make these choices in assembling his burrito.

106.    No customer is required to see the condiments and components to place an order at the restaurants.

107.    The Restaurants have accessible tables adjacent to the food service lines that can be used to view the food presented by Chipotle staff, at the customer's request

108.    All customers are able to direct the making of their entree.

109.    Chipotle employees are taught that the Customers' opportunity to see the food is an important part of the Chipotle experience.  In fact, regular inspections are made of the food to ensure the appearance is up to Chipotle standards.

110.    In all of his visits to Chipotle, Antoninetti was only shown food items by Chipotle employees at the Pacific Beach and Encinitas Restaurants during the site inspections of October 6, 2006.

111.    Chipotle focuses on one customer at a time, however long it takes.   For Chipotle, considerations of throughput, productivity or efficiency are secondary to ensuring a positive experience for disabled customers.

112.    Depending on their height, the level of their eyes and their vision, among other things, customers can see food items available for selection and the preparation or assembly of food items through the clear glass sneeze guard.

113.    Depending on their height, the level of their eyes and their vision, among other things, customers can see the food preparation counters, the food items available for selection and the preparation of their food.

13

114.    Although Chipotle intends to serve all of its customers fast, Chipotle focuses on one customer at a time, however long it takes.  For Chipotle, consideration of productivity or efficiency are secondary to ensuring a positive experience for disabled customers.

VII.

The exhibits to be offered at the trial, together with a statement of all admissions by and all issues between the parties with respect thereto, are attached as Appendix "A", hereto.

VIII.

Plaintiff's witness list:

Maurizio Antoninetti
Steven Schraibman
Jim Adams
Scott Shippey
Ronald Sedillo
Matthew Cieslak
Josefina Garcia
Kim Blackseth
Michael Rifkin*
James Perkins*
Jean Riker*
Nancy Bonica

Defendant objects to those witnesses designated with an asterisk (*) on the basis that they are cumulative, their testimony is irrelevant, and they lack personal knowledge.

Defendant's witness list:

Matthew Cieslak
Maurizio Antoninetti
Mrs. Maurizio Antoninetti
Nancy Bonica
Kim Blackseth
Steven Schraibman
Scott Shippey
Ronald Sedillo
Jim Adams
Josefina Garcia
Joe Stupp
Phil Petrilli **
Matt Scheiman**
Tim Spong **
Ben Williams **
Maritza Arriaga **

Jose Rivera **
Santiago Gonzales **
Erika Ramires **
Kevin Kupper **
Morgan Anderson **
Maria Perez **
Rene Saucedo **
Claudio Lopez **

Plaintiff objects to those witnesses designated with asterisks (**) on the basis that their testimony is cumulative, their testimony is irrelevant, they lack personal knowledge.

IX.

The following issues of law, and no others, remain to be litigated upon the trial:

1.      Whether the opportunity to see the bins of food items on display at the food assembly area is a "privilege, advantage and/or an accommodation" or a "good" or "service".

2.      Whether the opportunity to watch while one's entree is assembled at the food assembly area is a "privilege, advantage and/or an accommodation" or a "good" or "service".

3.      Whether the opportunity to see, select and direct the making of one's burrito at the food assembly area, in a minute or less, is a "privilege, advantage and/or an accommodation" or a "good" or "service".

4.      Whether the opportunity to customize a burrito by asking for more or less of an ingredient, while the entree is assembled at the food assembly area, is a "privilege, advantage and/or an accommodation" or a "good" or "service".

5.      Whether Defendant's "Policy" constitutes equivalent facilitation for customers in wheelchairs, pursuant to ADAAG Sec. 7.2(2)(iii).

6.      Whether ordering and receiving an entree, without the opportunity to see the assembly of the entree, is "equivalent facilitation."

7.      Whether Defendant's design of the food assembly area to have a 46-inch high wall and sneeze guard attachment was intentional, and whether this entitles Mr. Antoninetti to damages under Cal. Civil Code Section 52.

15

8.      Whether Defendant was required, pursuant to 42 U.S.C Sec. 12183, to design and construct the food assembly area so that the view of the food display and preparation area was visible to people in wheelchairs with eye levels between 43 and 51 inches high.

9.      Whether Defendant shall be required to modify the food assembly area walls so that the food viewing areas are visible to people with eye levels between 43 and 51 inches high, including people in wheelchairs.

10.      Whether providing people in wheelchairs the opportunity to see food ingredients by placing them in sample cups, by tongfuls or handfuls, is a "separate benefit" that is not necessary to provide an "equal benefit" and whether it is therefore not "equivalent facilitation", as defined by ADAAG Sec. 2.2.

11.      Whether people with disabilities must request accommodations before Chipotle is required by law to provide accommodations pursuant to its "Policy".

X.

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

XI.

This case shall be tried by the Court without a jury.

XII.

The trial of this case shall not be bifurcated.

XIII.

Time estimated for trial is five days.

Dated:_____, 2007

_____
NAPOLEON A. JONES,
United States District Judge

16

APPROVED AS TO FORM AND CONTENT
EXCEPT AS TO OBJECTIONS AND MOTION
TO AMEND ORDER FILED SEPARATELY
PURSUANT TO FRCP RULE 16(e):

LAW OFFICES OF AMY B. VANDEVELD


September 18, 2007                    /s AMY B. VANDEVELD
                                     Attorney for Plaintiff
                                     Email: abvusdc@hotmail.com


GREENBERG & TRAURIG


September 18, 2007          By:      /s JOHN F. SCALIA
                                     Attorney for Defendant
                                     Email: Scaliaj@gtlaw.com

17