1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURIZIO ANTONINETTI<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE MEXICAN GRILL, INC.,<br>AND DOES 1 THROUGH 10, inclusive,<br><br>Defendants. | Civil No. 05CV1660-J (WMc)<br><br>Related to & Consolidated for Discovery<br>with 06cv2671 (WMc)<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, AND<br>JUDGMENT** |

On August 22, 2005, Plaintiff Maurizio Antoninetti ("Plaintiff") brought this action against Defendant Chipotle Mexican Grill, Inc. ("Defendant" or "Chipotle") under Title III of the Americans with Disabilities Act ("ADA") and under the California Disabled Persons Act ("CDPA").[1]  Plaintiff asserted that Defendant denied him full and equal access to two of its restaurants, one located at 268 N. El Camino Real in Encinitas (the "Encinitas Restaurant") and the other located at 1504 Garnet Avenue in San Diego (the "Pacific Beach Restaurant") (collectively the "Restaurants").  Specifically, Plaintiff alleges that the 44 inch high wall in front of the Restaurants' food preparation counters obstructs his view of the preparation counters and thereby denies him the right to see the food ingredients and customize his food order.

---

[1]Plaintiff also had asserted a claim under the California Unruh Civil Rights Act ("Unruh Act"). Since a party seeking damages and other relief under the CDPA may not also seek relief under the Unruh Act, *see* Cal. Civ. Code § 54.3(c), Plaintiff abandoned his Unruh Act claim in favor of his CDPA claim.

In its June 14, 2007 Order on the Parties' Cross Motions for Summary Judgment, this Court held that Section 7.2(2) of the ADA Accessibility Guidelines ("ADAAG") applies to the wall in front of the food preparation counters at the Restaurants. Under Section 7.2(2), a portion of the main counter that is a minimum of 36 inches in length must have a maximum height of 36 inches; alternatively, an auxiliary counter with a maximum height of 36 inches must be provided in close proximity to the main counter, or some other "equivalent facilitation" must be provided. This Court found that the 34 inch high transaction station attached to the food preparation counters, at which cash registers are located, was not "a portion of the main counter" or an "auxiliary counter" within the meaning of ADAAG Subsections 7.2(2)(i) and (ii). This Court further found that a genuine factual dispute existed as to whether Defendant's practice and policy of accommodating customers with disabilities constituted an "equivalent facilitation" under ADAAG Subsection 7.2(2)(iii).[2]

This Court held a bench trial in this action on November 27, 29, 30 and December 3, 2007. The issues presented at trial were as follows: (1) whether Defendant's prior practice of accommodating customers with disabilities constituted equivalent facilitation under Section 7.2(2)(iii); (2)whether Defendant's written Customers with Disabilities Policy constitutes equivalent facilitation under Section 7.2(2)(iii); (3) whether Plaintiff is entitled to an injunction requiring Defendant to lower the wall in front of the Restaurants' food preparation counters; and (4) the amount of damages, if any, that Plaintiff is entitled to under the CDPA based on his visits to the Restaurants.

After considering all of the evidence admitted at trial and the argument of counsel, the Court makes the following findings set forth in detail below: (1) Defendant's prior practice of accommodating customers with disabilities, including customers in wheelchairs, did not

---

[2]Plaintiff also claimed that the Restaurants' men's restrooms, seating areas and parking areas were inaccessible and that the entrances to the Pacific Beach Restaurant were inaccessible. This Court adjudicated these claims in its June 17, 2007 summary judgment order. In particular, this Court; granted Defendant's Motion for Summary Judgment as to Plaintiff's ADA and CDPA claims regarding the restrooms and seating areas of the two Restaurants and the entrances to the Pacific Beach Restaurant; granted Defendant's Motion for Summary Judgment as to Plaintiff's ADA claim regarding the Restaurants' parking lots because Defendant had made alterations to the parking lots after the filing of Plaintiff's suit to ensure compliance with the ADA; and granted Plaintiff's Motion for Summary Judgment as to his CDPA damages claim related to the Restaurants' parking lots because the parking lots did not comply with the ADA prior to Defendant's alterations.

constitute equivalent facilitation under Section 7.2(2)(iii) of the ADAAG; (2) Defendant's current written Customers With Disabilities Policy constitutes equivalent facilitation under Section 7.2(2)(iii) of the ADAAG; (3) Plaintiff is not entitled to an injunction requiring Defendant to lower the wall in front of the Restaurants' food preparation counters; and (4) Plaintiff is entitled to a total of $5000.00 in damages for the occasions on which he encountered barriers to his entrance into Defendant's restaurants.

### *Factual Findings*

## I.    Chipotle Restaurants

1.      Chipotle is a restaurant founded by Steve Ells, who is presently the company's Chief Executive Officer.  Mr. Ells is a classically trained chef and a graduate of the Culinary Institute of America.  In 1993, Mr. Ells opened the first Chipotle restaurant.  In creating Chipotle, Mr. Ells sought to apply his classical training and knowledge of high-quality food and service to a quick service Mexican food restaurant.  Reporter's Transcript of Court Trial in Maurizio Antoninetti v. Chipotle Mexican Grill, No. 05-CV-1660 (hereinafter "TR"), at p. 511, ln. 8 - p. 514, ln. 6 (November 30. 2007).

2.      The Chipotle experience consists of the architecture, décor, and music of the restaurants, the aroma of the food, the appearance of a customer's entrée, Chipotle's friendly staff, its tradition of excellent customer service, the ability to customize one's entrée, and above all, the taste of the food.  The ability to see the freshness of the quality ingredients available at Chipotle's restaurants is a significant part of the Chipotle experience but has always been of secondary importance to the appearance and taste of the food once it has been prepared and served to the customer.  The most important aspect of the Chipotle experience is the experience of eating and enjoying one's food.  TR, at p. 203, lns. 13-18; p. 278, ln. 19 - p.280, ln. 18 (November 29, 2007); TR, at p. 641, ln. 1 - p. 642, ln. 5 (December 3, 2007); Ex. 58.

3.      Defendant provides specific details for the appearance of its food.  The chicken is required to be served with dark caramel grill lines on it.  Customers can actually see if the rice is bright white or has freshly chopped cilantro in it.   If the rice, for example, is not bright white, visually fresh, with vibrant green cilantro, Chipotle staff are instructed to remove the rice.  [Trial Ex. 1, p. 10-1700; 68: 19-69:5; Trial Ex. 1, p. 10-1666]

05CV1660 J (WMc)

4.  Defendant opened the Pacific Beach Restaurant in April of 2002.  Amended Pretrial Order, Section III, ¶9; TR, at p.16, lns. 18-19; p. 17, ln. 24 - p. 19, ln. 7 (November 27, 2007).

5.  The City of San Diego issued the Certificate of Occupancy for the Pacific Beach Restaurant on April 1, 2001.  Amended Pretrial Order, Section III, ¶31; TR, at p. 27, lns. 16-18; p. 27, ln. 25 - p.19, ln. 7 (November 27, 2007).

6.  Defendant opened the Encinitas Restaurant in May of 2002.  Amended Pretrial Order, Section III, ¶10; TR, at p. 16, lns. 19-21; p. 17, ln. 24 - p. 19, ln. 7 (November 27, 2007).

7.  The City of Encinitas issued the Certificate of Occupancy for the Encinitas Restaurant on May 15, 2002.  Amended Pretrial Order, Section III, ¶30; TR, at p. 27, lns. 13-15; p. 27, ln. 25 - p. 28, ln. 3 (November 27, 2007).

**II.  Plaintiff**

8.  Plaintiff uses a wheelchair for mobility.  Amended Pretrial Order, Section III, ¶39; TR, at p. 28, ln. 25 - p. 29, ln. 1; p. 29, ln. 15 - p. 30, ln. 14 (November 27, 2007).

9.  Since immigrating from Italy to the United States in 1991, Plaintiff has been involved in over 100 accessibility lawsuits, as either a plaintiff or a paid plaintiff-side accessibility consultant/expert witness.  TR, at p. 470, ln. 16 - p. 471, ln. 23; p. 472, ln. 25 - 474, ln. 25; p. 475, ln. 1- p. 476, ln. 1; p. 477, ln. 9 - p. 484, ln. 21 (November 30, 2007).

10.  Plaintiff has served as a paid plaintiff-side accessibility consultant/expert witness in over fifty accessibility cases for the law firm of Pinnock & Wakefield, a law-firm specializing in plaintiff-side accessibility litigation.  TR, at p. 483, ln. 24 - p. 484, ln. 4 (November 30, 2007).

11.  Plaintiff has served as a paid accessibility consultant/expert witness for his counsel of record in this case in at least fifty plaintiff-side accessibility lawsuits.  TR, at p. 484, lns. 5-10 (November 30, 2007).

12.  Plaintiff has served as a paid accessiblity consultant/expert witness for the brother of his counsel of record in this case in other plaintiff-side accessibility lawsuits.  TR, at p. 484, lns. 11-16 (November 30, 2007).

13.  In addition to his involvement in the above suits, Plaintiff has also personally sued at least twenty-two establishments or business for alleged accessibility violations.  TR, at p. 470,

ln. 16 - p.471, ln. 23; p. 472, ln. 25 - 474, ln. 25; p. 475, ln. 1 - p. 476, ln. 1; p. 477, ln. 9 - p. 483, ln. 18; p. 483, ln. 24 - p. 484, ln. 21 (November 30, 2007).

14.     On one occasion Plaintiff spent several hours visiting a mall in the Oceanside, California area ("Oceanside Mall") for the sole purpose of looking for accessibility violations. TR, at p. 477, ln. 9 - p. 483, ln. 18 (November 30, 2007).

15.     Plaintiff did not visit Oceanside Mall as a customer.  He visited the Mall because the aforementioned law firm of Pinnock & Wakefield suggested that he do so.  Plaintiff brought along with him, for his visit to Oceanside Mall, a measuring tape and camera to use while looking for accessibility violations.  Plaintiff visited Oceanside Mall in the hopes that the law firm would retain him as a paid accessibility consultant/expert witness in any lawsuits it would file against the Oceanside Mall for alleged accessibility violations.  TR, at p. 477, ln. 9 - p. 483, ln. 18; p. 505, ln. 20 - p. 506, ln. 11 (November 30, 2007).

16.     As a result of his visit to Oceanside Mall, Plaintiff agreed to be, and in fact became, a plaintiff in accessibility lawsuits that Pinnock & Wakefield filed on his behalf against at least eighteen separate business that had stores at Oceanside Mall.  TR, at p. 477, ln. 9 - p. 483, ln. 18; p. 505, ln. 20 - p. 506, ln. 14 (November 30, 2007).

17.     Even though he had gone to Oceanside Mall for the purpose of looking for accessibility violations with the hope of being retained by Pinnock & Wakefield as a paid consultant/expert witness, Plaintiff alleged in the aforementioned lawsuits that he had suffered physical injury as a result of his visits to the establishments.  TR, at p. 567, ln. 11 - p. 572, ln. 3 (November 30, 2007).

18.     Neither Plaintiff nor Pinnock & Wakefield made any attempt to resolve his accessibility claims with Oceanside Mall establishments before filing the lawsuits.  Plaintiff settled his suits against Oceanside Mall establishments for cash payments.  He never returned to Oceanside Mall after receiving his cash settlements.  TR, at p. 477, ln. 9 - p. 483, ln. 18 (November 30, 2007).

19.     Plaintiff filed an accessibility lawsuit against San Diego Pier Café.  He made no attempt to resolve his accessibility concerns with that restaurant before filing his lawsuit.  He later settled that lawsuit for a cash payment from the defendant.  He never returned to the

1  restaurant after receiving his cash settlement.  TR, at p. 470, ln. 16 - 471, ln. 23 (November 30,
2  2007).

3        20.    Plaintiff filed two accessibility lawsuits against two Dixieline Lumber Company
4  stores.  He made no attempt to resolve his accessibility claims with Dixieline Lumber Com-
5  pany's corporate office before filing suit, and he settled those lawsuits for cash payments from
6  Dixieline.  TR, at 472, ln. 25 - 474, ln. 25 (November 30, 2007).

7        21.    In one of his lawsuits against Dixieline Lumber Company, Plaintiff claimed that
8  the store's customer service counter was too high for customers in wheelchairs.  In his settlement
9  of that case, Plaintiff agreed that it was not necessary that the store lower its counter and that it
10  was acceptable that the store agree to provide increased customer service by way of providing
11  additional employees to assist customers in wheelchairs.  TR, at p. 463, ln. 25 - 465, ln. 5
12  (November 30, 2007)

13        22.    Plaintiff filed an accessibility lawsuit against a Holiday Inn Hotel in downtown
14  Los Angeles as a result of a single visit to the hotel.  He made no attempt to resolve his accessi-
15  bility claims with Holiday Inn's corporate management before filing suit.  He settled that lawsuit
16  for a cash payment, and he never returned to the hotel after receiving his cash settlement.  TR, at
17  p. 475, ln. 1 - p. 476, ln. 1 (November 30, 2007).

18        23.    Plaintiff filed an accessibility lawsuit against a restaurant called "Mr. Bertrand"
19  based on a single visit.  He made no attempt to resolve his accessibility claims with that restau-
20  rant's management before filing suit.  He settled that lawsuit for a cash payment, and he never
21  returned to the restaurant after receiving his cash settlement.  TR., at p. 476, ln. 9 - p. 477, ln. 8
22  (November 30, 2007).

23        24.    In the instant case, Plaintiff testified at trial that he believes he should be able to
24  see the food along the Restaurants' food serving lines in exactly the same manner as those
25  standing customers who are tall enough to see over the wall.  TR, at p. 460, ln. 7 - p. 461, ln. 9
26  (November 30, 2007).

27        25.    Plaintiff testified that he visited the Encinitas Restaurant on two occasions - first in
28  February of 2005 and again during the October 6, 2006 site inspections conducted during the
discovery process in this litigation.  Plaintiff testified that he visited the Pacific Beach Restaurant

on six occasions - once in February of 2005, once with his son, twice with his family, once with his wife, and once during the October 6, 2006 site inspections.  He testified that two of these six visits were for the purpose of gathering evidence for this litigation.  TR, at p. 425, ln. 24 - p. 426, ln. 11; p. 448, ln. 25 - p. 449, ln. 14 (November 30. 2007).

26.    Plaintiff filed this lawsuit after only one visit to the Encinitas Restaurant and one visit to the Pacific Beach Restaurant.  The remainder of Plaintiff's visits to the Restaurant were made after he filed this lawsuit.  TR, at p. 425, ln. 24 - p. 426, ln. 11; p. 436, lns. 5-12; p. 444, lns. 11-25 (November 30, 2007).

27.    Except for his visit to the Pacific Beach Restaurant made three days before his deposition in this case, and the October 6, 2006 site-inspection conducted as part of this litigation, Plaintiff could not recall, and made no effort to record, the dates or details of the visits that he made to the Pacific Beach Restaurant after he filed this lawsuit.  TR, at p. 423, ln. 15- p.426, ln. 11; p. 441, ln. 21 - p. 442, ln. 11; p. 447, ln. 21 - p. 449, ln. 14 (November 30, 2007).

28.    Plaintiff made the second of his two visits to the Encinitas Restaurant, and at least two of his visits to the Pacific Beach Restaurant, for the purpose of gathering evidence for this lawsuit.  He conducted the October 6, 2006 site inspections of the Pacific Beach and Encinitas Restaurants during the discovery process of this litigation for the purpose of gathering evidence in support of his claims; and he visited the Pacific Beach Restaurant on October 1, 2006, three days before his deposition, with the intent of repeating what he claimed were his prior bad experiences in order to prepare for his deposition and gather evidence to support his claims in this lawsuit.  TR, at p. 422, ln. 21 - p. 423, ln. 14; p. 425, ln. 24 - p. 426, ln. 11; p. 442, ln. 4 - p. 443, ln. 1; p. 453, ln. 19 - p. 454, ln. 3 (November 30, 2007).

29.    Plaintiff admitted at trial that on each and every occasion he visited the Pacific Beach and Encinitas Restaurants, he received a good burrito and could not identify any mistakes that had been made in his orders. TR, at p. 435, ln. 24 - p. 436, ln. 4; p. 451, ln. 24 - p. 452, ln. 22 (November 30, 2007).[3]

---

[3]Plaintiff's only complaint about any of the burritos he received was that on one occasion the ingredients in his burrito were not "mixed" as well as they had been on previous occasions.  Defendant asserts that its employees do not "mix" the ingredients in a burrito prior to rolling the burrito.  Rather,

30.     Plaintiff admitted at trial that during each and every one of his visits to the Pacific Beach and Encinitas Restaurants, Chipotle's employees were always polite and never rude to him.  TR, at p. 451, lns. 12-23; p. 459, lns. 12-14 (November 30, 2007).

31.     Plaintiff admitted at trial that, to his knowledge, during each and every one of his visits to the Pacific Beach and Encinitas Restaurants, his fellow customers were never rude to him or impatient with him.  TR, at p. 453, lns. 4-10; p. 459, lns. 15-17 (November 30, 2007).

32.     As with each of his previous accessibility lawsuits, Plaintiff made no attempt to resolve his accessibility claims with Defendant's corporate management before filing this lawsuit.  TR, at p. 437, ln. 6 - p. 438, ln. 20 (November 20, 2007).

**III.    Defendant's Employees**

33.     Ronald Sedillo is Defendant's Direct of Training.  TR, at p. 509, ln. 13 - p. 511, ln. 7 (November 30, 2007).

34.     Jim Adams is Defendant's Director of Marketing.  One of Mr. Adams' functions as Director of Marketing is to supervise the tracking of customer e-mail complaints made on Defendant's website.  TR, at p. 252, lns. 9-20; p. 255, lns. 13-16 (November 29, 2007); TR, at p. 642, lns. 6-11 (December 3, 2007).

35.     Ben Williams is currently the Area Manager for Defendant's North County stores, which includes the Encinitas Restaurant.  Mr. Williams has held this position since May of 2007. Prior to this position, Mr. Williams was the General Manager of the Pacific Beach Restaurant from December of 2005 through August of 2005.  TR, at p. 578, ln. 1 - p. 579, ln. 17 (November 30, 2007).

36.     Matthew Cieslak is the current General Manager of Chipotle's La Jolla restaurant. Before that, he was the General Manager of the Pacific Beach Restaurant, from November of 2005 through January of 2007.  Chipotle's written Customers With Disabilities Policy had not been implemented during Mr. Cieslak's tenure as the General Manger of the Pacific Beach Restaurant.  As such, Mr. Cieslak did not testify about the written Customers With Disabilities

---

the ingredients requested by a customer are stacked, one on top of the other, on the burrito, and the burrito is simply rolled.  TR, at p. 17, ln. 2 - p. 19, ln. 7 (November 27, 2007); TR, at p. 451, ln. 24 - p. 452, ln. 22 (November 30, 2007).

05CV1660 J (WMc)

Policy.  Instead, Mr. Cieslak testified solely about Defendant's prior unwritten practice of providing accommodations to customers with disabilities as part of its overarching commitment to excellent customer service.  TR, at p. 35, ln. 20 - p. 36, ln. 3 (November 27, 2007); TR, at p. 221, ln. 24 - p. 222, ln. 4; p. 319, ln. 20 - p. 321, lns. 17 (November 29, 2007).

37.    Maritza Arriaga is the current General Manager of the Encinitas Restaurant.  She has held that position since September of 2006.  TR, at p. 597, ln. 22 - p. 598, ln. 9 (December 3, 2007).

38.    Kevin Kupper is the current General Manager of the Pacific Beach Restaurant.  He has held that position since January of 2007.  TR, at p. 622, ln. 13 - p. 623, ln. 16 (December 3, 2007).

39.    Defendant's restaurant management team consists of one General Manager, an Apprentice Manager, and at least one Kitchen Manager and Service Manager.  At least one of these managers is on duty at all times during business hours.  TR, at p. 350, ln. 9 - p. 351, ln. 1 (November 29, 2007).

**IV.    The Construction of the Restaurants' Food Serving Lines**

40.    The Restaurants are constructed with a 44 inch high wall between the line of customers and the food preparation area (hereinafter "the Wall").  Amended Pretrial Order, Section III, ¶29; TR, at p. 27, lns. 10-12; p. 27, ln. 25 - p. 28.  ln. 3 (November 27, 2007).

41.    Transparent sneeze guards are located at the tops of the Wall and held in place by metal strips about 2 inches high.  Sneeze guards are required along the food service lines at the restaurants pursuant to CURFFL Sections 114080(b)(2)(A) and 114080(c) and Health & Safety Code Section 114080.  Amended Pretrial Order, Section III, ¶32; TR, at p. 27, lns. 19-24; p. 27, ln. 25 - p. 28, ln. 3 (November 27, 2007).

42.    The top of the metal strip that holds the sneeze guard in place above the Wall is approximately 46 inches from the finished floor.  Amended Pretrial Order, Section III, ¶33; TR, at p. 28, lns. 4-6; p. 29, ln. 15 - p. 30, ln. 14 (November 27, 2007).

43.    The food preparation counters, on the side of the Wall where the food crew works, are approximately 34-35 inches from the finished floor.  Amended Pretrial Order, Section III, ¶34; TR, at p. 28, lns. 6-8; p. 29, ln. 15 - p. 30, ln. 14 (November 27, 2007).

44.     A portion of the food preparation counter, approximately four feet in length, extends beyond the Wall and is completely unobstructed.  That portion of the counter consists of the expo station[4] and the cash register station, and meets the requirements of the ADAAG. Amended Pretrial Order, Section III, ¶51; TR, at p. 31, lns. 24-25; p. 32, lns. 1-4 (November 27, 2007); TR, at p. 219, lns. 7-15 (November 29, 2007).

**V.     The View for People in Wheelchairs**

45.     The average eye level of persons in wheelchairs is between 43 and 51 inches from the finished floor.  [Stip. Fact No. 35.]

46.     If a person's eyes are at a height of 51 inches, and are 12 inches from the wall at the food service line, the person can see no portion of the food service counter, the food items available for selection, or the preparation of their food.  [Stip. Fact No. 37.]

47.     If a person's eyes are at a height of 43 inches and are 12 inches from the wall at the food service line, the person can see no portion of the food service counter, the food items available for selection, or the preparation of their food.  [Stip. Fact No. 38.]

**VI.     The Ordering Process at Defendant's Restaurants**

48.     Customers who order their food in the Restaurants place their food orders in the Restaurants' food service line.  The food service line consists of several stations.  The first station is the tortilla station, where the customer is asked which type of entrée  he or she would like ( a burrito, burrito bol, or tacos).  Amended Pretrial Order, Section III, ¶13; TR, at p. 17, lns. 2-6; p. 17, ln. 24 - p. 19, ln. 7 (November 27, 2007).

49.     If a customer selects a burrito, the tortilla is warmed at the tortilla station and then sent to the hot well table where the selected ingredients are placed on the tortilla.  Amended Pretrial Order.  Section III. ¶14; TR, at p. 17, lns. 2-9; p. 17, ln. 24 - p. 19, ln. 7 (November 27, 2007).

50.     The tortilla is then sent to the salsa station where additional items are placed on it

---

[4]The expo station is a portion of empty space on the counter where the cash register is located between the salsa station and the cash register.  The expo station is approximately 2½ to 3 feet in width. TR, at p. 172, lns. 17-19 (November 27, 2007); TR, at p. 219, lns. 7-15 (November 29, 2007).

and the burrito is then folded and wrapped.  The salsa station includes salsa, guacamole, cheese and lettuce.  Amended Pretrial Order, Section III, ¶15; TR, at p. 17, lns. 11-13; p. 17, ln. 24 - p. 19, ln. 7 (November 27, 2007).

51.     The customer finally proceeds to the cash register, where he or she pays for his or her order.  Amended Pretrial Order, Section III, ¶15; TR, at p. 17, lns. 11-13; p. 17, ln. 24 - p. 19, ln. 7 (November 27, 2007).

52.     Defendant's employees provide customers, particularly first-time customers, with in-depth explanations of each of the items available on the menu.  TR, at p. 204, In. 18 - p. 205, In. 18 (November 29, 2007).

53.     It is common for customers to look up at the menu boards in the course of selecting and customizing their entrées.  TR, at p. 203, ln. 22 - p. 204, ln. 2 (November 29, 2007).

54.     Customers make their food selections by looking at the large menu boards hung above the food preparation counters at the Restaurants and communicating with the crew employees.  The menu boards describe the entrées and ingredients available at the Restaurants. TR, at p. 92, ln. 20 - p. 93, ln. 20 (November 27, 2007); TR, at p. 204, ln. 18 - p. 205, ln. 18; p. 207, lns. 2-12; p. 247, ln. 21 - p. 248, ln. 5 (November 29, 2007); Ex. 13, at pp. T-1 - T-5.

55.     Printed menus containing descriptions of the entrées and food ingredients are also available for customers to use in selecting their entrées.  TR, at p. 222, lns. 5-19 (November 29, 2007); TR, at p. 450, lns. 8-17 (November 30, 2007); TR, at p. 600, ln. 13 - p. 601, ln. 15 (December 3, 2007).

56.     Defendant's employees are trained to take any steps necessary to ensure that each and every customer's experience meets with the desires and needs he or she expresses to the crew members and that the experience is 100% enjoyable.  TR, at p. 211, lns. 1-16 (November 29, 2007); TR, at p. 576, lns. 6-25 (November 30, 2007).

57.     Defendant understands that people "eat with their eyes."  TR, at p. 117, lns 21-23, Ex. 1, p. 10-1666.  (November 29, 2007).

58.     Some people are visual eaters and if the food looks good, they will want to eat it. TR, at p. 112, lns. 6-11.  (November 29, 2007).

59.     In order to ascertain whether a customer may require special assistance with the ordering process, Chipotle employees are trained to look for and read customers' oral communications and non-oral cues, the latter of which includes "body language" and customers who look confused, customers who intently study the menu board, or customers who are craning their neck to see behind the food serving counter.  TR, at p. 217, lns. 9-16 (November 29. 2007); TR, at 531, ln. 24 - 532, ln. 12; p. 533, ln. 9-p. 534, ln. 10 (November 30, 2007); TR, at p. 600, ln. 13 - p. 601, ln. 15; p. 618, lns. 12-15; p. 636, ln. 22 - p. 637, ln. 8 (December 3, 2007).

60.     Some customers do not want to have food ingredients described to them or to interact with the Defendant's employees behind the food service counter.  In such cases, the Defendant's employees act in accordance with the customer's wishes.  TR, at p. 538, ln. 19 - p. 539, ln. 25 (November 30, 2007).

61.     Defendant's employees are trained to orally repeat each food ingredient requested by the customer as the customer proceeds down the food service line in order to ensure that the correct ingredients are placed on the customer's order and that no mistakes are made.  TR, at p. 207, lns. 2-12 (November 29, 2007).

62.     If at any point a customer believes that a mistake has been made in the preparation of his or her entrée, Defendant will prepare a new entrée for the customer free of charge upon request.  TR, at p. 206, ln. 16 - p. 207, ln. 1 (November 29, 2007).

63.     Not all standing customers at the Restaurants order their food in the same way.  TR, at p. 204, lns. 3-5 (November 29, 2007).

64.     Not all standing customers at the Restaurants are tall enough to see over the Wall.  Those customers cannot see the food ingredients in the pans behind the Wall, unless some accommodation is provided.  TR, at p. 204, lns. 6-17 (November 29, 2007).

65.     Defendant has always made accommodations for all customers - including customers in wheelchairs and non-disabled standing customers who are not tall enough to see over the Wall - who indicate, either through oral or non-oral cues, a desire to see the food ingredients on the food preparation counters or to see their entrées being made.  Those accommodations include describing the food ingredients to the customer, showing the customer samples of food ingredients in serving spoons or portion cups, or assembling the customer's

entrée at the expo station or at a table in the seating area.  TR, at p. 216, lns. 5-22; p. 217, lns. 9-p. 218, ln. 19; p. 219, ln. 20 - p. 220, ln. 6 (November 29, 2007); TR at p. 542, ln. 8 - p. 543, ln. 3: p. 584, ln. 14 - p. 585, ln. 7 (November 30, 2007); TR, at p. 599, ln. 19 - p. 604, ln. 12; p. 618, lns. 12-15 (December 3, 2007).

66.     Defendant has determined that the temperature of the food, along with the appearance and color of the food, affects the flavor of the food.  The food is required to be served "hot from the grill."  TR, at p. 117, lns. 2-5; Ex. 1, p. 10-1700.

67.     The ingredients of a burrito do not lose their freshness or heat if they are brought to a customer at a table in the seating area.  TR, at p. 540, lns 7-16 (November 30, 2007).

68.     The Restaurants possess a stock of four ounce portion cups that can be used to display or sample food ingredients for customers.  Those potion cups hold Chipotle's standard serving size of four ounces for each ingredient.  TR, at p. 36, lns. 11-18; p. 177, lns. 13-18 (November 27, 2007).[5]

69.     Standing customers who can see over the Wall are only able to see the top layer of the food in the pan.  TR, at p. 462, ln. 17 - p. 463, ln. 4 (November 29, 2007).

70.     Throughput is a measure of how quickly customers can proceed through the food serving lines at Chipotle's restaurants.  Throughput is measured differently at each Chipotle restaurant.  While the starting point for tracking throughput may vary, the end point is always the moment at which a customer completes his or her transaction at the cash register.  TR, at p. 208, lns. 12-15; p. 315, lns. 11-17; p. 329, ln. 11 - p. 331, ln. 8 (November 29, 2007).

71.     Considerations of throughput are secondary to ensuring that each customer receives outstanding personalized service.   Any conflict between throughput and excellent customer service are resolved in favor of affording each customer personalized attention to his or her needs or desires.  TR, at p. 211, ln. 1 - p. 213, ln. 7; p. 330, ln. 13 - p. 330, ln. 22 (November 29, 2007).

72.     During Matthew Cieslak's tenure as General Manager of the Pacific Beach

---

[5]For a period of time the serving size for rice was 5 ounces.  That serving size has been reduced to 4 ounces.  TR, at p. 108, lns. 5-13; p. 177, ln. 19 - p. 178, ln. 8.

Restaurant, the average time at that Restaurant for a customer to proceed from the tortilla station (at the start of the food service line) through the cash register station (at the end of the food service line) was approximately two minutes. TR, at p. 208, ln. 16 - p. 209, ln. 2 (November 29, 2007).

73.     Customers with multiple orders, children, or special requests, or first-time customers, frequently take longer than two minutes to proceed from the tortilla station to the cash register station. Serving a first-time customer can take up to ten minutes. TR, at p. 209, lns. 5-22; p. 345, ln. 15 - p. 346, ln. 3 (November 29, 2007).

74.     Defendant has always trained its restaurant employees to identify first-time customers, and to accommodate them by asking them if they would like to have Chipotle's menu, food ingredients, and food preparation process described to them, if they would like to sample the food, or some combination of those options. TR, at p. 303, lns. 13-25 (November 29, 2007).

75.     Accommodating first-time customers can require Chipotle employees to spend more time assisting those customers than is typically necessary to serve regular customers. TR, at p. 303, lns. 13-25 (November 29, 2007).

76.     A customer who requests to have his or her entrée assembled at the expo station will not impede other customers from ordering or paying for their food, because those other customers are allowed and physically able to proceed past the customer who is having his or her entrée assembled at the expo station directly to the cash registers. TR, at p. 218, ln. 20 - p. 219, ln. 19 (November 29, 2007).

77.     The cash station is one of the slowest parts of the food service line. Therefore, a customer who requires above-average time to proceed from the tortilla station through the salsa station on the food serving line will not necessarily adversely affect the time that it takes the customers behind him or her to proceed through the line. TR, at p. 341, ln. 22 - p. 342, ln. 14 (November 29, 2007).

78.     At Chipotle the appearance of the food in the serving pans behind the Wall has always been of secondary importance to the appearance of the food once it has been prepared and served to the customer. TR, at p. 203, lns. 13-18 (November 29. 2007).

79.     The most important aspect of the Chipotle experience is the experience of eating and enjoying one's food.  TR, at p. 641, lns. 14-21 (December 3, 2007).

**VII.    Chipotle's Culture and Philosophy of Customer Service**

80.     Historically, the culture and philosophy of Chipotle has been to pass on internal information regarding the company's policies and practices orally and not in writing.  TR, at p. 520, ln. 25 - p. 522, ln. 5 (November 30, 2007).

81.     The "WOW Factor" is a term that Chipotle has coined to describe its policy of going above and beyond its customers' expectations with respect to customer service.  Examples of applications of the "WOW Factor" include, but are not limited to, purchasing a customer's food if he or she has lost or forgotten his or her wallet, offering to buy food for a regular customer's colleagues, calling a tow truck if a customer is experiencing difficulties with his or her car, visiting a customer at a table to check on him or her after he or she has purchased an entrée, offering samples of the food ingredients, and helping a customer to his or her table.  TR, at p. 213, ln. 24 - p. 215, ln. 10 (November 29, 2007).

82.     All of Defendant's employees are trained on its policy of exceeding customers' expectations with respect to customer service.  That training consists of the materials in Chipotle's management guide "The Know" and personal instruction from one Chipotle employee to another.  TR, at p. 215, ln. 11-24; TR, at p. 333, ln. 2 - p. 335, ln. 11 (November 29, 2007).

83.     "The Know" is a reference guide for Chipotle's restaurant managers.  It contains all of the information that Chipotle's managers are required to know, including information regarding the company's policies and practices.  TR, at p. 520, ln. 25 - p. 522, ln. 5 (November 30, 2007).

84.     One method by which Chipotle's policies and practices are conveyed to its employees is through the restaurant General Manager's pre- and post-shift meetings with his or her managers and crew members.  TR, at p. 522, ln. 6 - p. 523, ln. 8 (November 30, 2007).

85.     A significant aspect of Chipotle's employee training consists of "shoulder-to-

shoulder" training, in which restaurant employees teach and learn from one another about Chipotle's practices and policies, both written and unwritten, by working in close proximity with one another and observing one another.  TR, at p. 333, ln. 13  - 334, ln. 8 (November 29, 2007).

**VIII.   Chipotle's Previous Practice of Accommodating All Customers**

86.     At all times prior to the implementation of the written Customers with Disabilities Policy in the spring of 2007.  Defendant maintained a philosophy and practice of accommodating any customer - including, but not limited to, customers in wheelchairs - who wanted to see the available food ingredients or watch the preparation of their food.  That practice included a requirement that employees of the Restaurants show customers in wheelchairs samples of the food ingredients in serving spoons or portion cups, or assemble the customer's food at the expo station or at a table in the Restaurants' seating areas.  This practice of accommodating customers with disabilities has always been part of the Company's overall commitment to providing excellent customer service, commonly referred to within Chipotle as "the WOW Factor."  TR, at p. 196, lns. 8-12; p. 215, ln. 25 - p. 216, ln. 22; p. 327, ln. 7 - p. 328, ln. 15; p. 335, ln. 12-16 (November 29, 2007; TR, at p. 530, lns. 22-24; p. 576, lns. 6-25 (November 30, 2007); TR, at p. 599, ln. 19 - p. 603, ln. 22 (December 3, 2007).

87.     Under this practice, Chipotle's restaurant employees have always been trained to look for non-oral cues from a customer, such as confused looks or intense review of the menu boards or printed menus, as potential requests for assistance, and, based on such non-oral cues, to offer to accommodate that customer.  TR, at p. 217, ln. 9 - p. 217, ln. 9 - p. 218, ln. 19 (November 29, 2007); TR, at 531, ln. 24 - p. 532, ln. 12; p. 533, ln. 9 - p. 534, ln. 10 (November 30, 2007); TR, at p. 600, ln. 13 - p. 601, ln. 15; p. 618, ln. 12-15 (December 3, 2007).

88.     Ron Sedillo was first instructed on Chipotle's practice of accommodating customers with disabilities when he was being trained as a restaurant General Manager in 1998. TR, at p. 332, ln. 17 - p. 333, ln. 12; p. 335, ln. 12 - p. 336, ln. 4 (November 29, 2007); TR, at p. 509, ln. 20 - p. 511, ln. 7 (November 30, 2007).

89.     Ron Sedillo has served customers in wheelchairs by preparing a burrito at a table

in the restaurant's seating area, and has, on more than one occasion, witnessed other Chipotle employees preparing burritos for wheelchair users at tables in the restaurant's seating area. TR, at p. 336, ln. 5 - p. 337, ln. 16; p. 343, lns. 14-20 (November 29, 2007).

90.     During the period in which Ben Williams was employed as the General Manager of the Pacific Beach Restaurant, he understood that Chipotle's philosophy and practice of going above and beyond its customers' expectations with respect to customer service required him and his employees to accommodate customers with disabilities, including customers in wheelchairs, who required or who otherwise appeared to need assistance in placing their orders. He under-stood that customer service philosophy and practice to require that his employees raise samples of food ingredients, or assemble a customer's entrée at the expo station or at a table in the restaurant's seating area. TR, at p. 583, ln. 14 - p. 585, ln. 7 (November 30, 2007).

91.     During the period in which Matthew Cieslak was employed as the General Manager of the Pacific Beach Restaurant, he understood that as part of the "Wow Factor" he and his employees were required to accommodate customers with disabilities, including customers in wheelchairs, who requested or otherwise appeared to need assistance in placing their orders. He understood Chipotle's customer service philosophy and practice to require that he and his employees raise samples of food ingredients, tilt the pans containing the food ingredients to allow customers to see the contents of the pans, or assemble a customer's entrée at the expo station or at a table in the restaurant's seating area. TR, at p. 215, ln. 25 - p. 216, ln. 22; p. 217, lns. 9-16 (November 29, 2007).

92.     The aforementioned accommodations have always been available to all customers who are not tall enough to see over the Wall and who indicate, either orally or through non-oral cues, a desire to see the food ingredients on the foot preparation counters. TR, at p. 217, ln. 9 - p. 218, ln. 19; p. 219, ln. 20 - p. 220, ln. 6 (November 29, 2007).

93.     Matthew Cieslak provided such accommodations, and witnessed other employees providing such accommodations, to customers at the Pacific Beach Restaurant during his tenure as the General Manager of that restaurant. TR, at p. 217, ln. 21 - p. 218, ln. 19 (November 29, 2007).

94.     Matthew Cieslak personally served a customer in a wheelchair on several

occasions while he was the General Manager of the Pacific Beach Restaurant.  He asked the customer if there was any assistance he could provide him, and the customer declined assistance because the customer knew exactly what he wanted.  The customer was able to proceed through the food service line as quickly and easily as standing customers who could see over the Wall at the restaurant.  TR, at p. 220, ln. 8 - p. 221, ln. 2; p. 245, ln. 20 - p.246, ln. 4; p. 247, ln. 12-20 (November 29, 2007).

95.    During his tenure as the General Manager of the Pacific Beach Restaurant Matthew Cieslak never received any complaints from any customers in wheelchairs stating that they could not see the food ingredients or that they could not see their entrées being assembled.  TR, at p. 221, lns. 9-23 (November 29, 2007).

96.    During his tenure as General Manager of the Pacific Beach Restaurant, Matthew Cieslak was responsible for training the employees of that restaurant.  TR, at p. 37, lns. 16-18 (November 27, 2007).

97.    As General Manager of the Pacific Beach Restaurant, Matthew Cieslak trained the restaurant's employees in Chipotle's general policy of excellent customer service.  TR, at p. 213, ln. 21-23 (November 27, 2007).

98.    As General Manager of the Encinitas Restaurant, Maritza Arriaga has applied Chipotle's general policy of providing excellent customer service to customers with disabilities. On one occasion, Ms. Arriaga served two elderly women who entered her store using walkers. Ms. Arriaga noticed that the women had sat down at a table without entering the food service line.  Ms. Arriaga approached the women, introduced herself, provided them with written menus and described the food to them in detail. The women asked Ms. Arriaga to place their orders for them.  She did so, and promptly brought the orders to their table.  The women appeared to Ms. Arriaga to be pleased with the service they had received.  TR, at p. 600, ln. 13 - p. 601, ln. 15 (December 3, 2007).

99.    Even before the implementation of the written Customers With Disabilities Policy, Chipotle's managers and employees were evaluated on their adherence to the company's culture, philosophy and practice of providing excellent customer service, which, as set forth above,

18

1   included a general requirement to accommodate customers with disabilities or customers with

2   special needs.  TR, at p. 528, lns. 15-25 (November 30, 2007).

3       100.   Defendant has never received any complaint from any customer in a wheelchair at

4   the Restaurants (other than Plaintiff's lawsuit).  TR, at p. 642, ln. 6 - p. 643, ln. 7 (December 3,

5   2007).

6   **IX.   Chipotle's Written Customers with Disabilities Policy**

7       101.   In February of 2007, Chipotle implemented a nationwide "Customers With

8   Disabilities Policy" setting forth in writing, methods to continue providing excellent customer

9   service to all its customers, including customers with disabilities.   The written policy was

10   intended to improve Defendant's customer service to disabled customers by giving its managers

11   and employees clearer directions with respect to the service of customers with disabilities in

12   particular.  TR, at p. 319, ln. 20 - p. 321, ln. 17 (November 29, 2007); TR, at p. 524, ln. 9 - p.

13   525, ln. 12; p. 534, lns. 11-20 (November 30, 2007).

14       102.   Between February and May of 2007, Chipotle conducted a nationwide

15   rollout of the Customers With Disabilities Policy, which included training at the restaurant level

16   and at the two Restaurants that are the subject of this case.  TR, at p. 525, ln. 25 - p. 528, ln. 3; p.

17   575, ln. 16 - p. 576, ln. 5; p. 581, ln. 20 - p. 583, ln. 9; p. 592, ln. 3-25 (November 30, 2007); TR,

18   at p. 599, lns. 7-18; p. 605, ln. 18 - p. 606, ln. 22; p. 624, ln. 13-23; TR, at p. 626, lns. 10-19

19   (December 3, 2007).

20       103.   In early February 2007, Chipotle disseminated the Customers With Disabilities

21   Policy to its Human Resources Training Directors, who supervise the training of Chipotle's

22   employees in the field, and its Operations Directors, who oversee each of the markets in which

23   the restaurant has presence.  Each of Chipotle's Human Resources Training Directors and

24   Operations Directors was fully familiarized with the Customers With Disabilities Policy.  On or

25   about February 26, 2007, Chipotle provided a written copy of the Customers With Disabilities

26   Policy to each of its Regional Directors, Operations Directors, and Human Resources Training

27   Directors by electronic mail.  Ronald Sedillo then began attending Regional Meetings and

28   Operations Meetings around the country where he discussed with Chipotle's Area Managers,

Regional Staff, Operations Directors and Human Resources Training Directors; the Customers

With Disabilities Policy, its importance, and the proper manner in which it was to be carried out. The Operations Directors, in turn, ensured that the Area Managers were thoroughly familiarized with the policy, and the Area Managers, in turn, ensured that Chipotle's General Managers were fully trained in the policy.  The General Managers then ensured that their management teams and crew members fully understood the policy.  Finally, the Customers With Disabilities Policy was officially incorporated into the Know.  TR, at p. 525, ln. 25 - p. 527, ln. 20; p. 581, ln. 20 - p. 583, ln. 9 (November 30, 2007); TR, p. 599, lns. 7-99 (December 3, 2007).

104.    As part of the training on the Customers With Disabilities Policy that was rolled out to the employees of the Encinitas Restaurant.  Ben Williams held an Area patch meeting in May of 2007 at which Mr. Williams discussed the Customers With Disabilities Policy in detail with all of the General Managers and Apprentice Managers within his Area - including Maritza Arriaga.  During the patch meeting, Mr. Williams had his managers act out role playing scenarios involving customers with disabilities to illustrate how the new policy regarding the accommoda- tion of customers with disabilities should implemented.  TR, at p. 578, lns. 1-25 (November 30, 2007); TR, p. 592, ln. 3-25 (December 3, 2007).

105.    Ms. Arriaga, the current General Manager of the Encinitas Restaurant, was informed of the written Customers With Disabilities Policy by e-mail in April of 2007, and subsequently attended the May 2007 Area patch meeting that Ben Williams held.  Ms. Arriaga subsequently trained the managers and crew members in the Encinitas Restaurant on the Customers With Disabilities Policy by orally reviewing the policy, and providing examples of the policy in practice.  Some of this training took place in meetings Ms. Arriaga held with her staff in between their shifts.  TR, at p. 578, lns. 1-25 (November 30, 2007); TR, p. 592, lns. 3-25; p. 599, lns. 9-18; p. 605, ln. 18 - p. 606, ln. 22 (December 3, 2005).

106.    Kevin Kupper, the current General Manager of the Pacific Beach Restaurant, was instructed on how to carry out the Customers With Disabilities Policy by his Area Manager in a patch meeting in May of 2007.  TR, at p. 624, ln. 13-23 (December 3, 2007).

107.    Kevin Kupper trained his employees in the Pacific Beach Restaurant on the

1    Customers With Disabilities Policy by, among other things, discussing the policy with his

2    managers and crew members before the start of their shifts.  TR, at p. 527, ln. 21 - p. 528, ln. 3

3    (November 30, 2007); TR, at p. 636, lns. 10-19 (December 3, 2007).

4        108.    New managers that come up through the ranks of Chipotle's employees are trained

5    on the Customers With Disabilities Policy by their senior managers.  Restaurant managers who

6    join Chipotle from outside the company receive training on the Customers With Disabilities

7    Policy during their orientation.  TR, at p. 575, ln. 16 - p. 576, ln. 5 (November 30, 2007).

8        109.    Defendant ensures that its employees adhere to the Customers With Disabilities

9    Policy through the company's employee review process.  Defendant's restaurant crew members

10   are evaluated twice a year.  Defendant's restaurant managers are reviewed quarterly (and are

11   eligible for a raise one review period each year).  During each review process, the Area Managers

12   and Operations Directors responsible for supervising the restaurant managers and employees in

13   the geographic areas under their supervision review all aspects of a restaurant's performance

14   including its employees' adherence to Chipotle's policies.  TR, at p. 5234, ln. 9 - p. 524, ln. 8; p.

15   528; lns. 4-14 (November 30, 2007); Ex. 10.

16       110.    Defendant's Customers With Disabilities Policy provides as follows:

17                     Excellent customer service is of paramount
        importance at every Chipotle restaurant at all times.  A
18      customer with a disability (for example, a visual or
        mobility impairment) may benefit from some alternative
19      means of presenting or describing our food.  In all such
        cases the restaurant staff will offer a suitable accommoda-
20      tion based on the individual circumstances, and will be
        responsive to the customer's requests.  Depending on the
21      circumstances, our crew member or manager may ask the
        customer if we can accommodate them during their visit.
22      Examples of some of the ways we accommodate individu-
        als include:
23
                1.    Samples of the food can be placed in
24                    soufflé cups and shown or handed to the
                      customer.
25
                2.    Some customers may prefer an opportunity
26                    to see or even sample the food at a table.

27              3.    Customers may simply wish to have the
                      food or food preparation process described
28                    to them.

21

05CV1660 J (WMc)

4.   Or combinations of the above accommodations with any other reasonable accommodation requested or appropriate for the individual.

The point of good customer service is that it has to be personalized. It is the manager and crew's responsibility to ensure that the experience a customer with a disability has is excellent.

Consideration of throughput, productivity or efficiency are secondary to ensuring a positive experience for disabled customers. Crew members are encouraged to inform their Restaurant Manager regarding the experiences of their disabled customers and such experiences will be considered during the performance review process, both for the crew member and the manager.

The above example details a scenario involving only a visual or mobility impaired customer. Other disabilities may exist among our customers and it is our policy at Chipotle to make good faith, reasonable accommodations for all of our disabled customers. This practice is consistent with our goal of providing excellent customer service to all of our customers. TR, at p. 525, lns. 13-24; p. 529, ln. 1 - p. 530, ln. 20 (November 30, 2007) Ex. 10.

111.   Under the Customers With Disabilities Policy, the manager on duty at the Restaurants (who can be a General Manager, Apprentice Manager, or Service Manager) is responsible for greeting any customer with a disability, whom the manager does not recognize to be a regular customer, at the tortilla station and determining what, if any, accommodations is required. The manager on duty first inquires if the customer has been to a Chipotle restaurant before. If the customer responds that he or she has been to a Chipotle restaurant before, the manager on duty is required to inform the customer to "let me know if I can help you or if you need anything." If the customer responds that he or she has not been to Chipotle restaurant before, the manager on duty is required to inform the customer of the accommodations available to him or her. Specifically, the manager on duty must affirmatively inform the customer that the manager can describe the menu in detail to the customer, show the food to the customer, have the customer sample the food, take the food ingredients to the expo station and assemble the customer's entrée there, take the food ingredients to a table in the dining area and assemble the customer's entrée there, or a combination of any of those accommodations. TR, at p. 319, ln. 20 - p. 321, ln. 3; p. 349,

lns. 4-18; p. 350, ln. 9 - p. 351, ln. 1 (November 29, 2007); TR, at p. 580, ln. 16 - p. 581, ln. 19 (November 30, 2007); TR, at p. 598, ln. 14 - p. 599, ln. 8; TR, at p. 623, ln. 17 - p. 624, ln. 12, p. 624, ln. 24 - p. 625, ln. 19 (December 3, 2007).

112.   The written Customers With Disabilities Policy did not change the substantive accommodations available to Chipotle's customers, all of which have always been available to both able-bodied and disabled customers alike. Rather, the written Customers With Disabilities Policy focused and clarified Chipotle's prior accommodations practices to customers with disabilities in particular. It also imposed two new requirements with respect to the process of applying those preexisting accommodations to customers with disabilities in particular. First, it established that it is the responsibility of the manager on duty at the restaurant, rather than his or her crew members, to carry out the policy (by requiring the manager on duty to greet a customer with a disability and inquire as to whether he or she desires any accommodations as soon as he or she approaches the tortilla station in the food serving line). Second, it established that the manager on duty must affirmatively inform the customer with a disability of the various accommodations options without waiting for the customer to request them. TR, at p. 337, ln. 25 - p. 338, ln. 11; p. 339, ln. 6 - p. 340, ln. 9 (November 29, 2007); TR, at p. 585, lns. 16-24 (November 30, 2007); TR, at p. 603, ln. 23 - p. 604, ln. 12 (December 3, 2007).

113.   Where a manager identifies a customer with a disability as a regular customer of the restaurant and where that customer, through oral or non-oral cues, has previously indicated whether and how he or she wants to be accommodated, the manager will attend to that customer based on his or her previously indicated preferences. TR, at p. 340, ln. 10 - p. 341, ln. 21 (November 29, 2007); TR, at p. 621, lns. 9-19; TR, at p. 625, ln. 20 - p. 626, ln. 9; p. 627, ln. 19 - p. 628, ln. 4; p. 636, ln. 22 - p. 637, ln. 12 (December 3, 2007).

114.   For example, if on previous visits a regular customer with a disability has indicated that he or she wanted to have food shown to him or her, the manager on duty will offer to show him or her food ingredients on future visits. TR, at p. 304, lns. 14-25 (November 29, 2007).

115.   However, even if a regular customer with a disability has declined accommodations on previous visits, if on a future visit he or she provides any non-oral cues that he or she may want to see the food ingredients, such as craning his or her neck while in the food

05CV1660 J (WMc)

service line, the manager on duty will observe those cues and offer to accommodate the customer at that time. TR, at p. 636, ln. 22 - p. 637, ln. 12 (December 3, 2007).

116.   Since the creation of the Customers With Disabilities Policy, Maritza Arriaga has witnessed her Apprentice Manager apply it on at least one occasion at the Encinitas Restaurant. Specifically, Ms. Arriaga witnessed a recent incident in which her Apprentice Manager immediately greeted a customer in a wheelchair who entered the Encinitas Restaurant and asked him if he had ever been to a Chipotle restaurant before. Based on Ms. Arriaga's observation, the customer appeared to be familiar with Chipotle's restaurants and appeared to decline her Apprentice's offer of assistance. Based on Ms. Arriaga's continued observation, the customer did not appear confused or frustrated at any point as he proceeded through the food serving line. TR, at p. 604, ln. 13 - p. 605, ln. 10; p. 607, ln. 25 - p. 609, ln. 3 (December 3, 2007).

117.   Kevin Kupper, as General Manager of the Pacific Beach Restaurant, has personally served at least one customer in a wheelchair at the Pacific Beach Restaurant since the implementation of the Customers With Disabilities Policy. Mr. Kupper first served that customer immediately before Chipotle disseminated the Customers With Disabilities Policy. Even under the prior practice of accommodating customers with special needs, Mr. Kupper took the initiative to greet that customer and ask him if there was any way he could be of assistance. That particular customer responded that he was not interested in any accommodations, and proceeded quickly through the food service line. In his subsequent visits to the Pacific Beach Restaurant, including his visits to the restaurant since the creation of the written Customers With Disabilities Policy, that customer has never indicated, either orally or through non-oral cues, that he desired to see samples of the food or desired any other accommodations. TR, at p. 626, ln. 20 - p. 628, ln. 4; p. 635, ln. 23 - p. 636, ln. 14 (December 3, 2007).

118.   Since implementing the new written Customers With Disabilities Policy, Chipotle has not received any complaints from any customer in a wheelchair regarding the accessibility of the Pacific Beach or Encinitas Restaurants. TR, at p. 463, ln. 25 - p. 465, ln. 5 (November 30, 2007); TR, at p. 593, ln. 1-20; p. 642, ln. 6 - p. 643, ln. 10; TR, at p. 606, ln. 23 - p. 607, ln. 24; p. 628, lns. 5-24 (December 3, 2007).

X.   **Plaintiff's Visits to the Restaurants**

24

119.    Although the Pacific Beach Restaurant is within walking distance of his house, Plaintiff has not visited that restaurant since October 6, 2006. TR, at p. 422, lns. 17-20; p. 425, ln. 24 - p. 426, ln. 11 (November 30, 2007).

120.    Plaintiff has not visited either of the Restaurants since the written Customers With Disabilities Policy was implemented. TR, at p. 321, lns. 4-17; p. 376, lns. 19-21 (November 29, 2007); TR, at p. 422, ln. 21 - 423, ln. 7; p. 425, ln. 24 - p. 426, ln. 11 (November 30, 2007).

121.    Plaintiff admitted at trial that, with respect to each and every visit that he made to the Encinitas and Pacific Beach Restaurants, he enjoyed the entrée he received and found nothing wrong with his order. TR, at p. 435, ln. 24 - p. 436, ln. 4; p. 451, ln. 24 - p. 452, ln. 22 (November 30, 2007).

122.    Plaintiff admitted at trial that during each and every one of his visits to the Pacific Beach and Encinitas Restaurants, Chipotle's employees were polite and never rude to him. TR, at p. 451, lns. 12-23; p. 459, lns. 12-14 (November 30, 2007).

123.    Plaintiff admitted at trial that, to his knowledge, during each and every one of his visits to the Pacific Beach and Encinitas Restaurants, his fellow customers were never rude to or impatient with him. TR, at p. 453, lns. 4-10; p. 459, lns. 15-17 (November 30, 2007).

124.    Plaintiff testified that he visited the Encinitas Restaurant on two occasions, and that one of those two visits was the October 6, 2006 site inspection conducted in connection with this litigation. TR, at p. 425, ln. 24 - p. 426, ln. 11 (November 30, 2007).

125.    Plaintiff testified that he first visited the Encinitas Restaurant in February of 2005. He testified that he was accompanied on this first visit by his son, who, although not disabled, could not see over the Wall without accommodation. Plaintiff admitted at trial that he understood how to use the menu board at the Encinitas Restaurant, and used it to place his and his son's orders. TR, at p. 433, lns. 5-22 (November 30, 2007).

126.    During his February 2005 visit to the Encinitas Restaurant, Plaintiff did not review any of the printed menus that were available to him in the restaurant. TR, at p. 450, lns. 4-19 (November 30, 2007).

127.    During his first visit to the Encinitas Restaurant, Plaintiff did not ask any Chipotle

25

employee to show him any samples of the food ingredients. TR, at p. 435, lns. 1-3 (November 30, 2007).

128.   Plaintiff's February 2005 visit to the Encinitas Restaurant was his only visit to that Restaurant either before or after filing this lawsuit (except for his site inspection). TR, at p. 425, ln. 24 - p. 426, ln. 11 (November 30, 2007).

129.   Plaintiff testified that he first visited the Pacific Beach Restaurant in February of 2005, approximately one week after his first visit to the Encinitas Restaurant. TR, at p. 436, lns. 5-8 (November 30, 2007).

130.   Plaintiff admitted at trial that he returned to the Pacific Beach Restaurant three days before his deposition in order to repeat what he claims was a "bad experience." Plaintiff admitted that the purpose of that visit was to prepare for his deposition and gather information for his claims against Chipotle. TR, at p. 442, ln. 4 - p. 443, ln. 1; p. 453, ln. 19 - p. 454, ln. 3 (November 30, 2007).

131.   Plaintiff's most recent visit to the Pacific Beach Restaurant was the October 6, 2006 site inspection of that Restaurant. TR, at p. 376, lns. 19-21 (November 29, 2007); TR, at p. 422, ln. 21 - 423, ln. 7; p. 425, ln. 24 - p. 426, ln. 11 (November 30, 2007).

132.   During the Pacific Beach Restaurant site inspection, Plaintiff was shown each of the food ingredients he requested to see as he moved down the food service line. TR, at p. 376, ln. 19 - p. 377, ln. 5 (November 29, 2007); TR, at p. 455, ln. 23 - 456, ln. 3; p. 459, lns. 6-11 (November 30, 2007).

133.   During the Pacific Beach Restaurant site inspection Plaintiff did not request to see the food in the pans behind the Wall or to have his entrée prepared at the expo station or at a dinning table. TR, at p. 457, ln. 21 - p. 458, ln. 5 (November 30, 2007).

134.   Plaintiff's most recent visit to the Encinitas Restaurant was the October 6, 2006 site inspection of that restaurant conducted by Plaintiff during the discovery process in this litigation. TR, at p. 376, lns. 19-21 (November 29, 2007); TR, at p. 422, ln. 21 - 423, ln. 7 (November 30, 2007).

135.   During the Encinitas Restaurant site inspection, Plaintiff was shown each of the

food ingredients he requested to see as he moved down the food service line by the restaurant's General Manager, Maritza Arriaga. TR, at p. 376, ln. 19 - p. 377, ln. 5 (November 29, 2007); TR, at p. 455, ln. 23 - 456, ln. 3; p. 459, lns. 6-11 (November 30, 2007); TR, at p. 601, ln. 24 - p. 603, ln. 22 (December 3, 2007).

136.    During the Encinitas Restaurant site inspection, as Ms. Arriaga held up samples of the food ingredients for Plaintiff to see, she described each ingredient and asked Plaintiff if the items she showed him were acceptable. Plaintiff indicated yes or no to each item, and indicated to Ms. Arriaga, through both oral communications and non-oral cues, that the accommodations she had provided to him were acceptable. Indeed, Plaintiff indicated to Ms. Arriaga that he was satisfied with the service he had received. TR, at p. 601, ln. 24 - p. 603, ln. 22 (December 3, 2007); Ex. 6.

137.    During the site inspection of the Encinitas Restaurant, Ms. Arriaga showed Plaintiff the exact portions of each ingredient that she was placing into his burrito before placing the ingredient in the burrito. Plaintiff did not indicate that he wanted more or less of any of the food ingredients he was shown. TR, at p. 601, ln. 24 - p. 603, ln. 22; p. 611, ln. 25 - p. 612, ln. 19 (December 3, 2007); Ex. 6.

138.    During the site inspection of the Encinitas Restaurant Plaintiff did not provide Ms. Arriaga with any non-oral cues indicating that he was frustrated, dissatisfied or desired further accommodations than those that had been provided. To the contrary, by affirmatively informing Ms. Arriaga that the samples of food that she showed him were acceptable, and by indicating through oral communications and non-oral cues that the service was acceptable, Plaintiff gave Chipotle every reason to believe that he was satisfied with its service and that he did not need or desire any further accommodations. TR, at p. 457, ln. 21 - p. 458, ln. 5 (November 30, 2007); p. 601, ln. 24 - p. 603, lns. 1-22; p. 615, lns. 16-20; p. 618, lns. 8-22 (December 3, 2007); Ex. 6.

139.    Plaintiff was able to communicate effectively with the Chipotle employees who served him during the site inspections of the Encinitas and Pacific Beach Restaurants. TR, at p. 458, ln. 9 - p. 459, ln. 11 (November 30, 2007).

140.    Plaintiff admitted that, during the site inspections of the Restaurants, he found the

samples that he was shown by the employees who served him (all of which represented actual serving sizes) to be very helpful in determining what to order. TR, at p. 463, lns. 16-21 (November 30, 2007).

141.    During the site inspections, it took Plaintiff approximately three minutes to proceed through the food service line. TR, at p. 405, lns. 19-21 (November 30, 2007).

142.    During the site inspections, it took Plaintiff only one minute longer to proceed through the food service lines of the Pacific Beach and Encinitas Restaurants than it takes an average customer to proceed through those lines, and significantly less time than it takes some first-time customers to proceed through the food service line. TR, at p. 208, ln. 16 - p. 209, ln. 2; p. 345, ln. 15 - p. 346, ln. 3 (November 29, 2007); TR, at p. 405, lns. 19-21 (November 30, 2007).

143.    Chipotle has never received any complaints from any customers in wheelchairs regarding the accessibility of the Pacific Beach or Encinitas Restaurants. TR, at p. 463, ln. 25 - p. 465, ln. 5 (November 30, 2007); TR, at p. 593, lns. 1-20; p. 642, ln. 6 - p. 643, ln. 10; TR, at p. 606, ln. 23 - p. 607, ln. 24; p. 628, lns. 5-24 (December 3, 2007).

144.    Neither Plaintiff nor his representatives made any effort to contact Chipotle's management to complain about his experiences at the Restaurants before filing this lawsuit. TR, at p. 437, ln. 6 - p. 438, ln. 20 (November 30, 2007).

## XI.    Parking at the Encinitas and Pacific Beach Restaurants

145.    Plaintiff did not introduce any evidence at trial that he encountered any barriers to his ability to use the handicapped parking spaces at the Encinitas Restaurant.

146.    Plaintiff testified that he encountered barriers in using the handicapped parking spaces on two occasions when he drove to the Pacific Beach Restaurant - namely, that a curb ramp protruded into the access aisle and the handicapped parking spaces. TR, at p. 420, ln. 6 - p. 422, ln. 16 (November 30, 2007).

### *Conclusions of Law*

## I.    Equivalent Facilitation

CL1.   The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, was enacted on July 26, 1990. The primary purpose of the ADA was to provide a "clear and comprehensive national mandate for the elimination of discrimination" with "clear, strong,

consistent, enforceable standards" to address such discrimination. *See* 42 U.S.C. § 12101(b)(1), (2).

CL2.   Plaintiff's ADA claims in this action are based on Title III of the ADA. Section 302 of Title III prohibits discrimination against disabled individuals in any place of public accommodation. 42 U.S.C. § 12182. Restaurants, bars and other establishments serving food or drink are public accommodations within the meaning of the ADA. 42 U.S.C. § 12181(7).

CL3.   Section 302 of Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a).

CL4.   Title III gives the Department of Justice the authority to develop regulations implementing the requirements of the anti-discrimination requirements of the statute. 42 U.S.C. §§ 12183(a)(1), 12186(b).

CL5.   Pursuant to that authority the Department of Justice has adopted the ADAAG, which set forth general construction guidelines to ensure that new facilities are accessible to persons with disabilities. 28 C.F.R. §§ 36.401(a)(1), (c)(1), 36.402 (a)(1), Appendix B – Preamble to Regulations on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,546 (July 26, 1991), p. 593. Failure of newly constructed facilities (such as the Encinitas and Pacific Beach Restaurants) to abide by the construction guidelines in the ADAAG violates the ADA. *Id.*; 42 U.S.C. § 12183(a)(1).

CL6.   A violation of Title III of the ADA also constitutes a violation of the CDPA. Cal. Civ. Code § 54(c), (d).  Under the CDPA, a plaintiff may only recover damages for each visit to a noncompliant place of public accommodation or each specific instance in which a plaintiff is deterred from attempting to visit a non-compliant place of public accommodation; CDPA damages may not be awarded for each alleged architectural barrier a plaintiff encountered during a single visit to a noncompliant place of public accommodation.  *See* Cal. Civ. Code § 54.3(a); *Molski v. Rapazzini Winery*, 400 F.Supp.2d 1208, 1211 (N.D. Cal. 2005); *Organization for the Advancement of Minorities with Disabilities v. Pacific Heights Inn*, 2006 US. Dist.

1   LEXIS 2049, *8-9 (N.D. Cal. Jan. 20, 2006); *Martinez v. Longs Drugs Stores*, 2005 U.S. Dist.

2   LEXIS 39236, *6 (E.D. Cal. August 25, 2005).

3        CL7.   This Court held in its June 14, 2007 Order on the Parties' Cross Motions for

4   Summary Judgment that the food preparation counters in Chipotle's restaurants must comply

5   with the requirements of ADAAG Section 7.2(2), which governs sales and service counters that

6   may not have a cash register but at which goods or services are sold or distributed. Section

7   7.2(2) of the ADAAG requires that either:

8               (1)   a portion of the main counter which is a mini-
                      mum of 36 in (915 mm) in length shall be
9                     provided with a maximum height of 36 in (915
                      mm); or
10
                (2)   an auxiliary counter with a maximum height of
11                    36 in (915 mm) in close proximity to the main
                      counter shall be provided; or
12
                (3)   equivalent facilitation shall be provided.
13

14   *Antoninetti v. Chipotle Mexican Grill, Inc.*, Case No. 05CV1660-J, Order on the Parties'

15   Motions For Summary Judgment, at 10-13 (S.D. Cal., June 14, 2007) (Jones, J.); 28 C.F.R. §

16   36, Appendix A §7.2(2).

17        CL8.   This Court also found in its Order on the Parties' Cross Motions for Summary

18   Judgment that the portion of the food service counter where the cash registers are located (the

19   transaction station), which is approximately 35 inches high, does not satisfy the requirements of

20   subsections (i) and (ii) of Section 7.2(2). *Antoninetti v. Chipotle Mexican Grill, Inc.*, Case No.

21   05CV1660-J, Order on the Parties' Motions For Summary Judgment, at 10-13 (S.D. Cal., June

22   14, 2007) (Jones, J.).  However, the Court found that Chipotle's practice and policy of provid-

23   ing accommodations to customers with disabilities may constitute an equivalent facilitation

24   under Section 7.2(2)(iii), depending on the resolution of factual disputes at trial.  *Id.*

25        CL9.   Under ADAAG Section 2.2, "departures from particular technical and scoping

26   requirements of the ADAAG by the use of other designs and technologies are permitted where

27   the alternative designs and technologies used will provide substantially equivalent or greater

28   access to and usability of the facility."  28 C.F.R. § 36, Appendix A §§ 2.2, 7.2(2)(iii).

         CL10.   Policies and practices that provide substantially equivalent or greater access to

and usability of a facility constitute a form of equivalent facilitation. *Antoninetti v. Chipotle Mexican Grill,Inc.*, Case No. 05CV1660-J, 2007 WL 2456223, *4 (S.D. Cal., August 23, 2007); 28 C.F.R. § 36, Appendix A § 7.2(2)(iii); *Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 727(D. Or. 1997); *Access 4 All, Inc. v. The Atlantic Hotel Condominium Association, LLC*, Case No. 04-61740 CIV COHN, 2005 U.S. Dist. LEXIS 41601, *47 (S.D. Fla. November 22, 2005).

CL11.   A defendant who chooses to utilize alternative methods that it believes will provide equal or greater access has the burden of demonstrating that the alternative design or technology qualifies as an equivalent facilitation.  *Ind. Living Center v. Oregon Arena,* 982 F.Supp. 698, 727; and *see* TAM (1994 supp.) § III-7.2100.

### A. Defendant's Unwritten Practice of Accommodations is not Equivalent Facilitation.

CL12.   Defendant's prior informal policy provided no directive to its employees about the methods that must be utilized to accommodate people in wheelchairs who want to see the food ingredients available for their entrées.  Under the unwritten practice of providing all customers, including customers with disabilities, excellent customer service; Defendant attempted to provide customers in wheelchairs with an experience that was similar to the experience of standing customers.  However, its managers and crew were to use their own judgment and common sense to determine when and how to accommodate a customer in a wheelchair.  This subjective interpretation and enforcement of Defendant's informal Policy rendered the unwritten policy incapable of uniform enforcement or a confidant conclusion that these actions were equivalent facilitation.

CL13.   California Civil Code Section 54 provides that people with disabilities are entitled to the same rights as non-disabled to the full and free use of public buildings, public facilities and other public places.  Civil Code Section 54 also provides that any violation of the Americans with Disabilities Act is a violation of Section 54(c). California Civil Code Section 54.3 also provides monetary damages to the plaintiff in the amount of $1000.00 for each and every offense of Civil Code Section 54.

CL14.   Evidence at trial provided that Plaintiff was a bona fide customer, and thus

entitled to damages for Defendant's failure to provide equivalent facilitation, to the Restaurants on at least five occasions.  The Court **FINDS** that Plaintiff is not entitled to recover any damages in connection with his visit to the Pacific Beach Restaurant three days before his deposition or in connection with site-inspection visits to the two Restaurants, because, in each instance, he was not a bona fide customer but rather was visiting those Restaurants as a litigant for the purpose of gathering evidence to support his claims in this litigation.  Accordingly, Plaintiff is entitled to $1000.00 for each visit to Chipotle as a bona fide customer before the filing of the lawsuit.

**B.     Defendant's Current Customers With Disabilities Policy is an Equivalent Facilitation.**

CL15.   This Court also finds that Defendant has met its burden of establishing that its Customers With Disabilities Policy provides Plaintiff (and other customers in wheelchairs) with substantially equal or greater access to its facilities.

CL16.   Unlike the prior unwritten policy, the written Customers With Disabilities Policy imposes two new requirements that render it equivalent facilitation where the prior unwritten policy is not.  Under the written Customers With Disabilities Policy, the pre-existing accommodations that Chipotle provided as part of its mission for excellent customer service are set forth plainly with two new requirements: (1) it is established that it is the responsibility of the manager on duty at the Restaurant, rather than his or her crew members, to carry out the policy (by requiring the manager on duty to greet a customer with a disability and inquire as to whether he or she desires any accommodations as soon as he or she approaches the tortilla station in the food serving line) and (2) it established that the manager on duty must affirmatively inform the customer with a disability of the various accommodations options without waiting for the customer to request them through oral communications or non-oral cues.

CL17.   The written policy, unlike the informal policy, describes at least three accommodations for customers in wheelchairs which provide substantially equal access to Chipotle facilities.  Under the written policy, the manager on duty is directed to greet customers in wheelchairs at the first station of the food service line and, if he or she does not recognize the individual as a regular customer, ask the individual if he or she has ever been to a Chipotle

32

restaurant.  If the customer responds that he or she has been to a Chipotle restaurant, the manager will advise the customer to alert the manager if he or she would like any assistance in placing his or her order.  If the customer responds that he or she has never been to a Chipotle restaurant before, the manager on duty will affirmatively inform the customer of the different ways that Chipotle can accommodate him or her during the ordering process.  Specifically, the manager will suggest that Chipotle employees can lift samples of the food ingredients using tongs or spoons, provide the customer with samples of each of the food items that the customer would like to see or taste in clear plastic portion cups, allow the customer to watch his or her entrée being assembled either at the expo station at the end of the food service line, or at a table in the dining area of the restaurant.  If the manager recognizes a customer with a disability as a regular customer of the restaurant, the manager will then apply his or her knowledge of the customer and the customer's past requests and preferences to determine whether the customer desires or needs any accommodations.  Where a regular customer repeatedly requests a certain kind of accommodation, that accommodation will be provided automatically by the manager. Where the customer indicates that he or she does not desire any accommodation, on subsequent visits the manager will not continue to inquire as to whether that customer desires accommodation, unless the customer indicates either orally or through non-oral cues that he or she may want or need to be accommodated.  Chipotle's managers are taught to observe both oral and non-oral cures from its customers, and to offer additional services to customers based on those cues.

CL18.   Defendant presented uncontroverted evidence that since the Customers with Disabilities Policy was created in February of 2007, the company has trained all of the managerial and crew member employees in the Restaurant on the Policy.  Furthermore, both General Managers of the Restaurants (Maritza Arriaga and Kevin Kupper) testified that they themselves have either personally applied the Customers With Disabilities Policy or witnessed it being applied by one of their managers.  Chipotle also presented uncontroverted evidence that there have been no complaints made against Chipotle by customers in wheelchairs regarding the acessiblity of the Restaurants (either before or after the implementation of the Customers with Disabilities Policy).

1    CL 19.    Plaintiff has presented no evidence to rebut the existence or effectiveness of the

2    Customers With Disabilities Policy itself, or of the training of Chipotle's employees at the

3    Restaurants concerning the Policy.  In fact, aside from his visit to the Pacific Beach Restaurant

4    which he testified was for the purpose of preparing for his deposition, and the site inspections of

5    the Restaurants conducted as part of the discovery process in this litigation, Plaintiff has not

6    visited the Restaurants after the Customers With Disabilities Policy was implemented.

7    CL20.    For these reasons, the Court **FINDS** that Defendant's current Customers With

8    Disabilities Policy provides Plaintiff (and other customers in wheelchairs) with equivalent

9    facilitation under ADAAG Sections 2.2 and 7.2(2)(iii).

10   **II. Injunctive Relief**

11   CL21.    The remedies available under Title III of the ADA are limited to injunctive

12   relief, including injunctive relief to require the defendant to alter facilities to make such

13   facilities "readily accessible to and usable by persons with disabilities," or, where appropriate,

14   injunctive relief "requiring the provision of an auxiliary aid or service, modification of a policy,

15   or provision of alternative methods." 42 U.S.C. § 12188(a)(2); 42 U.S.C. § 2000a-3(a). The

16   same injunctive relief is available under the CDPA. Cal. Civ. Code § 54.3(a).

17   CL22.    Injunctive relief is an equitable remedy, and is not available as a matter of

18   course. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982).  The specific elements that

19   must be proven in order to obtain injunctive relief are: (1) an irreparable injury; (2) inadequacy

20   of legal remedies; (3) a balance of hardships favoring the plaintiff; and (4) advancement of the

21   public interest. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998); *Zepeda v. INS*, 753 F.2d

22   719, 727 (9th Cir. 1983).  It is the plaintiff's burden to establish these elements. *West Point-*

23   *Pepperell, Inc. v. Donovan*, 689 F.2d 950, 956 (11th Cir. 1982).  Injunctive relief should be

24   denied unless it is the only means of ensuring compliance. *Weinberger* at 314.

25   CL23.   A plaintiff seeking injunctive relief under the ADA "must demonstrate that an

26   injunction . . . is justified by the relief it will provide."  *Access Now, Inc. v. South Florida*

27   *Stadium Corporation*, 161 F.Supp.2d 1357, 1369 (S.D. Fla. 2001).  "[W]hether a requested

28   alteration would be effective is relative to the impediment presented by the barrier and the

associated cost of removing it."  *Id.*, at 1369-70.

CL24.   Here, Plaintiff seeks an injunction requiring Chipotle to lower the Wall at the Restaurants to a maximum height of 36 inches.  For the following reasons, this Court **FINDS** that Plaintiff has failed to satisfy his evidentiary burden for his requested injunctive relief.

CL25.   This Court **FINDS** that Plaintiff has failed to satisfy his burden of establishing the existence of any irreparable injury.

CL26.   First, the uncontroverted evidence is that Plaintiff never visited either of the Restaurants as a bona fide customer after the implementation of the written Customers With Disabilities Policy; for this reason alone, he has failed to present any credible evidence that Chipotle's current accommodations policy and practices do not provide him with an equivalent facilitation.  Chipotle, on the other hand, has presented uncontroverted evidence that its Customers With Disabilities Policy is effective, and that, since its implementation, there have been no complaints by any customers in wheelchairs regarding the accessibility of the Restaurants' food serving lines.

CL27.   Second, in order to establish the existence of irreparable injury, Plaintiff must prove that he in fact plans to return to the Restaurants. *Molski v. Kahn Winery*, 405 F.Supp.2d 1160,1164 (C.D.Cal. 2005).  Where a plaintiff's plans to return to an establishment are not "concrete," the court must satisfy itself that a plaintiff's professed intent to return is sincere and supported by the facts.  *Molski*, 405 F.Supp.2d at 1164.  In determining whether a plaintiff has a sincere intent to return, the Court may consider the plaintiff's litigation history.  *Id.* (citing plaintiff's litigation history, as particularly telling with regards to his credibility as a witness and his professed intent to return to the defendant's establishment).

CL28.   Based on the evidence presented at trial, this Court **FINDS** that Plaintiff's purported desire to return to the Restaurants is neither concrete nor sincere or supported by the facts.  Plaintiff only visited the Encinitas Restaurant once (disregarding his site inspection conducted during the discovery process in this litigation).  That sole visit took place nearly three years ago, in February 2005.  This uncontroverted evidence belies Plaintiff's contention that he intends to return to the Encinitas Restaurant.  Even with respect to the Pacific Beach Restaurant**,** which Plaintiff testified was located within walking distance of his home, Plaintiff has not returned to that Restaurant since October 2006 - over a year ago.  He testified that he

first visited the Pacific Beach Restaurant in February 2005, and that, most recently, he visited the Restaurant twice in early October 2006 as a litigant (*i.e.,* in order to prepare for his deposition and for the site inspections).  Aside from these three visits, Plaintiff testified at trial that he was unable to recall the dates (or even the exact number) of his other visits to the Pacific Beach Restaurant - other than that they all occurred after he filed this lawsuit in August 2005.  Based on this evidence alone, this Court **FINDS** that Plaintiff has failed to meet his burden that he intends to return to either of the Restaurants.

CL29.   Plaintiff's history as a plaintiff in accessibility litigation supports this Court's finding that his purported desire to return to the Restaurants is not sincere. Since immigrating to the United States in 1991, Plaintiff has sued over twenty business entities for alleged accessibility violations, and, in all (but one) of those cases, he never returned to the establishment he sued after settling the case and obtaining a cash payment. In particular:

> i. Plaintiff filed an accessibility lawsuit against San Diego Pier Café without making any pre-lawsuit attempt to resolve his concerns with the restaurant's management. Plaintiff settled that lawsuit for a cash payment, and never returned to the restaurant.

> ii. Plaintiff filed two accessibility lawsuits against Dixieline Lumber Company without making any pre-lawsuit attempt to resolve his concerns with that company's corporate management. Plaintiff settled that lawsuit for a cash payment.

> iii. Plaintiff filed an accessibility lawsuit against a Holiday Inn hotel in downtown Los Angeles, after visiting that hotel only once and without making any pre-lawsuit attempt to resolve his concerns with the hotel's corporate management.  Plaintiff settled that lawsuit for a cash payment, and never returned to the hotel.

> iv. Plaintiff filed an accessibility lawsuit against a restaurant called Mr. Bertrand without making any pre-lawsuit attempt to resolve his concerns with the restaurant.  Plaintiff settled that lawsuit for a cash payment, and never returned to the restaurant.

> v. Furthermore, on one occasion Plaintiff filed lawsuits against at least eighteen different businesses based on a one-day visit to a shopping mall in Oceanside. Plaintiff had never shopped at that mall before.  He did not visit the mall as a customer.  Rather, Plaintiff visited that mall at the suggestion of a plaintiffs' side law firm specializing in the area of accessibility law for which Plaintiff had previously served as an paid accessibil-

ity/expert witness more than fifty times, and because he hoped that the law firm would retain him as a paid accessibility consultant/expert witness in any accessibility lawsuit(s) that it would file against the mall stores. Plaintiff brought with him to his visit a measuring tape and camera for the purpose of looking for accessibility violations.  As a result of his visit to the mall, Plaintiff agreed to be, and in fact became, a named plaintiff in accessibility lawsuits against at least eighteen separate businesses that had stores at the mall.  Even though he had gone to the mall for the purpose of looking for accessibil- ity violations with the hope of being retained as a paid consultant/expert witness, Plaintiff alleged in the mall lawsuits that he had suffered bodily injury as a result of his visits to the stores.  Plaintiff did not make any pre- litigation attempt to resolve his concerns with the manage- ment of the businesses that he sued. Plaintiff settled these lawsuits for cash payments, and never returned to the mall.

CL30.   Based on these facts, this Court **FINDS** that Plaintiff has failed to satisfy the required showing of irreparable injury. For these reasons, Plaintiff's demand for injunctive relief is **DENIED**.

CL31.   This Court also **FINDS** that Plaintiff has failed to meet his burden of proof that the requested injunction is in the public interest, particularly in light of Chipotle's uncontroverted evidence that it has served customers in wheelchairs at the Restaurants both before and after the written Customers With Disabilities Policy was implemented, and that it has never received any complaint from a customer in wheelchair regarding the accessibility of the food serving lines at the Restaurants.

CL32.   Finally, this Court **FINDS** that Plaintiff has failed to satisfy his burden that the requested injunction "is justified by the relief it will provide." *Access Now, Inc.*, 161 F.Supp.2d at 1369.  Plaintiff presented no evidence at trial either as to the reasons that Chipotle designed the Wall at the height that it did, or as to the cost or feasibility of enjoining Chipotle to lower the Wall to a maximum of 36 inches.  While Plaintiff and his expert witness testified that other restaurants have lower walls, such testimony does not constitute evidence as to the cost or feasibility of enjoining Chipotle to lower its counters.  Furthermore, the Court finds the photograph of the Subway store taken by Plaintiff's expert witness (which, as the last page of Exhibit 71, was admitted into evidence) uninformative and unpersuasive because it does not

1   fully and accurately depict the entire height of the wall from the floor to the bottom of the glass

2   sneeze guard.  In any event, the Subway photo seems to show that the wall at the Subway

3   store also exceeded 36 inches in height.

4        CL33.   For these reasons, this Court **DENIES** Plaintiff's demand for injunctive

5   relief under the ADA and the CDPA.

6   **III. Damages For The Parking Lots**

7        CL34.   Plaintiff seeks the statutory minimum of $1000.00 in damages for each occasion

8   on which he visited the Restaurants and encountered barriers to his ability to use the handi-

9   capped parking spaces at those Restaurants.

10       CL35.   At trial Plaintiff identified two occasions when he encountered the alleged

11  barriers to his ability to use the handicapped parking space at the Pacific Beach Restaurant.

12       CL36.   Plaintiff failed to present any evidence at trial establishing any occasions where

13  he encountered alleged barriers to his ability to use the handicapped parking space at the

14  Encinitas Restaurant.

15       CL 37.  Accordingly, Plaintiff is entitled to $2000.00 for his claims relating

16  to the Pacific Beach Restaurant parking lot, and is not entitled to recover any damages for any

17  alleged accessibility violations relating to the Encinitas parking lot.

18  **IV.  Plaintiff's Damages Award**

19       CL38.   Having found that Defendant's prior unwritten policy was not equivalent

20  facilitation under 7.2(2)iii of the ADAAG, and that Plaintiff was a bona fide customer to the

21  Restaurants on five total occasions (once to the Encinitas Restaurant and four times to the

22  Pacific Beach Restaurant); Plaintiff is entitled to $1000.00 for each visit to the Restaurants.

23  Accordingly, the Court awards Plaintiff a total of $5000.00 for Defendant's violation of the

24  ADA and CDPA.

25       CL39.   Although Plaintiff suffered harm at the parking lot of the Pacific Beach

26  Restaurant on two occasions, the CDPA provides does not provide damages for each and every

27  architectural barrier that a Plaintiff encounters.  Thus, although Defendant's failure to comply

28  with the ADA with regards to the parking barriers does entitle Plaintiff to relief, that relief is

1  capped at the $1000.00 that Plaintiff is already awarded for Defendant's failure to provide

2  Plaintiff with equivalent facilitation within the Restaurants.

3                                          *Conclusion*

4          While the Court is sympathetic to Plaintiff's, and other customers with disabilities,

5  request to have the same Chipotle experience that standing customers have, the evidence

6  suggests that Defendant's new written policy will provide a substantially equivalent experience

7  for customers with disabilities.  Absent evidence to the contrary, and with the understanding

8  that the ADA does not require that establishments provide exactly the same experience for

9  disabled customers as they do for non-disabled customers, the Court finds that Defendant's

10  written Customers With Disabilities Policy does provide equivalent facilitation.   For the above

11  reasons, the Court **FINDS** that Defendant's Customers With Disabilities Policy provides

12  equivalent facilitation under the guidelines of ADAAG 7.2(2)iii.  Additionally, the Court

13  **AWARDS** Plaintiff $5000.00, and no more, for Defendant's failure to accommodate under the

14  rules of the ADA and CDPA during Plaintiff's visits to Chipotle before the implementation of

15  the Customers With Disabilities Policy.

16          **IT IS SO ORDERED.**

17

18

19  DATED:  January 10, 2008

20  _____

21  HON. NAPOLEON A. JONES, JR.
    United States District Judge

22

23  cc: Magistrate Judge McCurrine
         All Parties of Record

24

25

26

27

28